**NAVAJO TRIBE OF INDIANS,**
**Plaintiff-Appellant,**

v.

**STATE OF NEW MEXICO, et al,**
**Defendants-Appellees.**

**Nos. 84–1418, 84–1764.**

United States Court of Appeals,
Tenth Circuit.

Jan. 9, 1987.

Rehearing Denied Feb. 25, 1987.

---

Paul E. Frye (Elmer J. Lincoln, Jr. with him on the briefs), Window Rock, Ariz., for plaintiff-appellant.

Norman S. Thayer of Sutin, Thayer & Browne, Albuquerque, N.M. (Stephen Charnas of Sutin, Thayer & Browne, Paul G. Bardacke, Atty. Gen. of N.M., Charlotte Uram and Douglas Meiklejohn, Asst. Attys. Gen., Office of the Atty. Gen., Santa Fe, N.M., with him on the brief), for defendant-appellee State of N.M.

Lynn H. Slade of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, N.M. (John R. Cooney, John S. Thal and Walter E. Stern of Modrall, Sperling, Roehl, Harris & Sisk, P.A., and Gary Crosby and Ellen Falk of Santa Fe Mining, Inc., Chicago, Ill., with him on the brief), for defendant-appellee Santa Fe Mining, Inc.

Maria A. Iizuka, Atty., Dept. of Justice, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., William L. Lutz, U.S. Atty. for the D. N.M., Richard L. Beal, Atty., Dept. of Justice, San Francisco, Cal., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with her on the brief), for defendant-appellee U.S. of America.

William J. Darling of Eaves, Darling, Anderson & Porter, P.A., Albuquerque, N.M., on the brief, for defendant-appellee Norman Ashcroft.

James Bruce of Hinkle, Cox, Eaton, Cofield & Hensley, Santa Fe, N.M., on the brief, for defendants-appellees Fernandez Co., Ltd. and Don R. Smouse.

Before BARRETT and McKAY, Circuit Judges, and THEIS, Senior District Judge *.

McKAY, Circuit Judge.

The primary issue in this appeal is whether Section 12 of the Indian Claims Commission Act (ICCA)[1] divests the district court of jurisdiction over the Navajo Tribe's cause of action against the United States to affirm its title to unallotted lands within an Executive Order reservation that was "restored to the public domain" before all congressionally mandated allotments had been made to the Navajos living on the reservation.

I.

On November 9, 1907, President Theodore Roosevelt issued Executive Order Number 709 which added approximately 1.9 million acres to the Navajo Indian Reservation in the territories of Arizona and New Mexico.[2] Shortly thereafter, when it was discovered that the boundaries of the reservation created by Executive Order 709 encroached upon the Jicarilla Apache Reservation, President Roosevelt issued Executive Order Number 744,[3] amending Executive Order Number 709 to correct the encroachment.[4] The President intended "that

* Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation.

1. Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049 (formerly codified as amended at 25 U.S.C. §§ 70 to 70v–2 (1976) (omitted from current Code because Indian Claims Commission terminated on September 30, 1978).

2. The order states:
It is hereby ordered that the following-described tract of country in the Territories of Arizona and New Mexico, viz: [description of metes and bounds] is hereby, withdrawn from sale and settlement and set apart for the use of the Indians as an addition to the present Navajo Reservation: *Provided,* That this withdrawal shall not affect any existing valid rights of any person.
Theodore Roosevelt.
Exec. Order No. 709 (1907), *reprinted in* H.R. Rep. No. 1663, 60th Cong., 1st Sess. 2 (1908).

3. The order states:
Whereas it is found that the Executive order of November 9, 1907, setting apart certain lands in Arizona and New Mexico as an addition to the Navajo Indian Reservation, conflicts in part with Executive order of November 11, 1907, setting apart certain lands as an addition to the Jicarilla Indian Reservation, N. Mex., said Executive order is hereby so amended that the description of the tract of land set apart as an addition to the Navajo Reservation shall read as follows:
[description of metes and bounds].
Theodore Roosevelt.
Exec. Order No. 744, *reprinted in* H.R.Rep. No. 1663, 60th Cong., 1st Sess. 2–3 (1908).

4. See appendix, sections marked J and K, for the relative size of these additions as compared to the rest of the Navajo Reservation.

a temporary reservation of the lands be made until such time as the Indian occupants could be allotted." [5]

The ink was barely dry on Executive Order Number 744 when a New Mexico congressman, in response to concerns of non-Indian settlers, introduced a joint resolution in Congress seeking to statutorily ensure prompt return to the public domain of all surplus, unallotted lands. The legislative report reflects the purpose of the joint resolution:

> The committee on Indian Affairs, to whom was referred the resolution (H.J. Res. 152) concerning the Navajo Indian Reservation in New Mexico, report the same back with the recommendation that it do pass.
>
> In view of the fact that the land in question was withdrawn from the public domain for allotment to the Indians in the northwestern part of New Mexico the necessity for and advisability of immediate legislation of this character is very apparent, for unless the resolution be passed before the adjournment of Congress the President will not have jurisdiction to restore the land as withdrawn and, furthermore, not allotted to public entry. The committee therefore has unanimously agreed upon, respectfully submits, and urgently recommends the passage of the resolution.
>
> This resolution was referred to the Office of Indian Affairs, Department of the Interior, and the Favorable report of that Office, which is made a part of this report, authenticates the virtue of this resolution.

> Department of the Interior,
> Office of Indian Affairs,
> Washington, April 30, 1908.

Sir: I am in receipt, by your reference for report thereon, of copy of House joint resolution No. 152, entitled "Joint resolution concerning the Navajo Indian Reservation in New Mexico."

The resolution authorizes the President, whenever he is satisfied that all the Indians in any part of the Navajo Reservation in New Mexico and Arizona, created by Executive orders of November 9, 1907, and January 28, 1908, have been allotted to restore the surplus lands to the public domain.

You are advised that, because of the large number of Indians residing on public lands adjacent to the Navajo Indian Reservation in New Mexico and Arizona without any title to the lands occupied by them, it was necessary, in order to protect them in their homes, that a temporary reservation of the lands be made until such time as the Indian occupants could be allotted. It was not and is not the intention of the Department that lands which will not be needed for allotment purposes be withheld from settlement and entry any longer than will absolutely be necessary to insure the Indians securing their homes under authority of law without interference from white settlers.

Special Allotting Agents William M. Peterson and J. D. Kent are at present engaged in making allotments to these Indians, and if the joint resolution should become a law it will be possible to restore the surplus lands to the public domain as fast as the Indians in any particular tract have all been allotted.

---

**5.** Letter from Mr. C.F. Larrabee, Acting Commissioner of Indian Affairs, to the Honorable J.S. Sherman, Chairman, House Committee on Indian Affairs. *See* Appendix A, Memorandum Brief of Santa Fe Mining, Inc. in Support of Motion to Dismiss, record, vol. 1, at 166.

For both selfish and humanitarian reasons, non-Indians in the late nineteenth and early twentieth centuries felt it crucial to destroy tribal life and to assimilate Indians into the mainstream of American life. *See* F. Cohen, Handbook of Federal Indian Law 128–32 (1982 ed.). The allotment concept implemented this policy by breaking up huge reservations held by the entire tribe, allotting plots of land to each tribe member, and then opening to non-Indian settlers the remainder of the prior reservation.

For a description of the background against which the lands in issue were withdrawn from settlement by Executive Order, see 1908 Commissioner of Indian Aff.Ann.Rep. 96.

The resolution has the approval of the Department, and it is therefore recommended that it be enacted as a law.

Copies of the Executive Orders of November 9, 1907, and January 28, 1908, creating the extension, are inclosed as requested.

Very Respectfully

C.F. Larrabee,
*Acting Commissioner*

Hon. J.S. Sherman
*Chairman, Committee on Indian Affairs*
*House of Representatives.*

H.R.Rep. No. 1663, 60th Cong., 1st Sess. 1–2 (1908). After a Conference Committee compromised House and Senate differences, the joint resolution was passed and sent to the President, who signed it into law on May 29, 1908. Section 25 of the Act provided:

That whenever the President is satisfied that all the Indians in any part of the Navajo Indian Reservation in New Mexico and Arizona created by Executive Orders of November ninth, nineteen hundred and seven, and January twenty-eighth, nineteen hundred and eight, have been allotted, the surplus lands in such part of the reservation shall be restored to the public domain and opened to settlement and entry by proclamation of the President.

Act of May 29, 1908, ch. 216, § 25, 35 Stat. 444, 457.

On December 30, 1908, President Roosevelt issued Executive Order Number 1000,[6] "restoring to the public domain"[7] unallotted lands within certain sections of the reservation created by Executive Order Number 709, as amended by Number 744, except for 110 unapproved allotments. Three years later, on January 16, 1911, President Taft issued Executive Order Number 1284,[8] restoring to the public domain additional surplus lands in that reservation. The United States thereafter, and before 1946, issued patents on parts of such land to the State of New Mexico as well as to the predecessors in interest of the defendant landowners in this case. The Tribe alleges in its complaint that, at the time Executive Orders Number 1000 and 1284 were issued, less than one-half of the eligible Navajos then living on the reservation had received allotments. For purposes of this appeal, we accept the Tribe's allegations as true.[9]

6. Executive Order Number 1000 (1908) states:
 It is hereby ordered that the unallotted lands in Tps. 17, 18, 19, 20, and 21 N., Rs. 5, 6, 7, and 8 W., and Tps. 22 and 23 N., Rs. 6, 7, and 8 W. of the New Mexico principal meridian, withdrawn from sale and settlement and set apart for the use of the Indians as an addition to the Navajo Reservation by Executive orders dated November 9, 1907, and January 28, 1908, be, and the same are hereby, restored to the public domain, except the following-described lands, embracing 110 unapproved allotments, namely:
 [description of allotments].
 Theodore Roosevelt.

7. In *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), the Supreme Court held that, standing alone, the phrase restored to "the public domain" does not evince explicit congressional intent to disestablish or diminish an Indian reservation. *Id.* at 475–76, 104 S.Ct. at 1168–69; *accord Ute Indian Tribe v. Utah,* 773 F.2d 1087, 1092 (10th Cir.1985) (en banc), *cert. denied,* — U.S. ——, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Nevertheless, the Navajo Tribe apparently concedes in this case that the above-quoted phrase in Executive Orders 1000 and 1284 was intended to disestablish the addition to the Navajo Reservation created by Executive Order 709, as amended by Executive Order 744. Instead, the Tribe argues that, notwithstanding Congress' intent to diminish, the President's orders were null and void as inconsistent with congressionally mandated prerequisites for such diminishment.

8. Executive Order Number 1284 (1911) states:
 It is hereby ordered that all lands not allotted to Indians or otherwise reserved within the townships in New Mexico added to the Navajo Reservation by Executive orders of November 9, 1907, and January 28, 1908, lying west of the first guide meridian west, be and the same hereby are restored to the public domain.
 Wm. H. Taft.

9. Navajo Tribe appeals from the district court's grant of the Government's motion to dismiss. When considering a motion to dismiss under Rule 12(b), the court must accept as true the facts alleged in the complaint. *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976).
 The Commission on Indian Affairs reported that 493 allotments were made in 1908 by Spe-

## II.

Until 1946, Indian tribes could not litigate claims against the United States unless they obtained specific permission from Congress. Although the Court of Claims was created nearly a century before to hear claims against the United States, Congress excluded from the court's jurisdiction Indian claims based on treaties. Act of March 3, 1863, ch. 92, § 9, 12 Stat. 765, 767. Sovereign immunity barred litigation of non-treaty claims. Year after year, tribes petitioned Congress for special jurisdictional acts authorizing the Court of Claims to hear their grievances against the United States; yet few of them succeeded. For those who did succeed, the process was costly, burdensome, and time-consuming. *See* H.R.Rep. No. 1466, 79th Cong., 1st Sess. 6 (1945); F. Cohen, *supra* note 5, at 563.

In 1928, this piecemeal scheme of resolving Indian claims against the Government

was severely criticized in the Meriam Report, an independent study conducted by the Institute for Government Research.[10] The Meriam Report recommended the establishment of an independent, fact-finding commission to facilitate the judicial solution of outstanding Indian claims against the United States. After studying various proposals, Congress finally enacted the Indian Claims Commission Act in 1946,[11] creating a quasi-judicial body to hear and determine all tribal claims against the United States that accrued before August 13, 1946.

The ICCA confined the Commission's jurisdiction to tribal claims that accrued before its 1946 enactment, while it conferred jurisdiction on the Court of Claims to adjudicate any tribal claim accruing after 1946 that would be cognizable in the Court of Claims if the claimant were not an Indian tribe. ICCA § 24, 28 U.S.C. § 1505 (1982).

Congress also limited the period for filing tribal claims with the Indian Claims

cial Allotting Agents William M. Peterson and Joseph G. Kent. 1908 Commissioner of Indian Aff.Ann.Rep. 96. The following year, the Commissioner reported the progress of the allotting agents:

> *Navajo extension (Arizona and New Mexico).* —Executive orders of November 9, 1907, and January 28, 1908, extended the boundaries of the Navajo Reservation over certain lands in the Territories of Arizona and New Mexico. Special Allotting Agents William M. Peterson and Joseph G. Kent have been engaged during the past year in making allotments to the Navajo Indians within this extension. They have completed allotments of 80 acres of agricultural or 160 of grazing lands to some 1,667 Indians. On December 1, 1908, the allotments within that part of the extension in New Mexico east of the first guide meridian, west, having been completed, the President, by executive order of December 30, 1908, restored the surplus unallotted lands there to the public domain. Allotments within the extension west of the first guide meridian, in New Mexico, have been practically completed, and it is expected that the surplus lands in this part of the extension will be restored to the public domain by executive order in the near future.

1909 Commissioner of Indian Aff.Ann.Rep. at 40.

On April 30, 1931, a subcommittee of the Senate Committee on Indian Affairs held a hearing in Crownpoint, New Mexico, as part of the Committee's survey of the conditions of Indians in the United States. Superintendent S.F. Stach-

er, who had been the agency superintendent at Crownpoint for more than twenty years, testified that there had been very few allotments made on the Executive Order reservation:

> Mr. Stacher.... I might say they began the allotment work on the public domain at the time the Executive Order extension was made, taking in part of this Navajo country, They made something like 2,500 allotments at that time, but in 1911 they disbanded the crews out here and they restored the surplus land to the public domain before the allotment work was completed.
>
> ....
>
> Senator Frazier. Are there more of the Indians that want allotments?
> Mr. Stacher. At the present time we have 3,500 not allotted. Of this number, there are about 2,500 to 3,000 that are eligible for allotments under the general allotment act.

*Survey of Conditions of the Indians in the United States: Hearings Before a Subcomm. of Senate Comm. on Indian Affairs,* 71st Cong., 3d Sess. 9575–76 (1931).

**10.** Institute for Government Research, *The Problem of Indian Administration* 48, 805–11 (L. Meriam ed. 1928).

**11.** A detailed discussion of the legislative development of the ICCA is contained in *Otoe & Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 131 F.Supp. 265, 272–75 & nn. 111–12, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

Commission to five years. Any claim that accrued before August 13, 1946, and which was not filed with the Commission by August 13, 1951, could not "thereafter be submitted to any court or administrative agency for consideration," nor could such a claim "thereafter be entertained by the Congress." ICCA § 12, 25 U.S.C. § 70k (1976).

Although the ICCA provided that the Commission would terminate at the end of ten years, Congress extended its life several times because of its enormous caseload.[12] The Commission was finally dissolved in 1978, at which time its remaining cases were transferred to the Court of Claims.[13]

Although the ICCA did not expressly address the extent of the Commission's remedial powers, the Commission, in one of its early opinions, construed the ICCA as limiting the available relief "to that which is compensable in money." *Osage Nation of Indians v. United States*, 1 Ind.Cl.Comm. 54, 65 (1948), *rev'd on other grounds*, 119 Ct.Cl. 592, 97 F.Supp. 381, *cert. denied*, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951); *see also The Western Shoshone Legal Defense & Educ. Ass'n v. United States*, 35 Ind.Cl.Comm. 457, 476 (1975), *aff'd*, 209 Ct.Cl. 43, 531 F.2d 495, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). The legislative history of the bills extending the life of the Commission confirms that this early interpretation of the ICCA was correct. According to one subcommittee report, the ICCA reflected a congressional policy that "[t]ribes with valid claims would be paid in money. No lands would be returned to a tribe." *Authoriz-*

ing *Appropriations for the Indian Claims Commission for Fiscal Year 1977: Hearing on H.R. 11909 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 2d Sess. 48 (1976). Furthermore, in response to a committee member's question whether the Commission "ever make[s] any adjudications which convey title to land for the Indian person," Chief Commissioner Watkins explained: "[W]e are an arm of the Congress for one definite purpose: to consider these ancient Indian claims. They either get an award in cash or their case is dismissed and they do not get anything. That is as far as they go." *Indian Claims Commission Act Extension and Enlargement: Hearings on H.R. 2536 and Related Bills Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 90th Cong., 1st Sess. 83 (1967).

### III.

Following the enactment of the ICCA, and within the prescribed five-year period for filing claims, the Navajo Tribe filed a claim with the Indian Claims Commission seeking compensation under section 2 of the Act for the cession of its lands, which included the lands defined in Executive Orders Number 709 and 744, to the United States under the Treaty of June 1, 1868, 15 Stat. 667. The Tribe contended that it held aboriginal title to approximately forty million acres of land at the time of the 1868 Treaty and that the United States had paid an unconscionably low price for the land. The Commission found that the Navajo

12. *E.g.*, Act of Mar. 30, 1972, Pub.L. No. 92–265, § 1, 86 Stat. 114; Act of Apr. 10, 1967, Pub.L. No. 90–9, § 1, 81 Stat. 11; Act of July 24, 1956, ch. 679, 70 Stat. 624. By 1975, the Commission had established 613 dockets in the 370 claims which had been filed by Indian tribes. *Authorizing Appropriations for the Indian Claims Commission for Fiscal Year 1977: Hearing Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs*, 94th Cong., 2d Sess. 27 (1976). By 1977, awards by the Commission pursuant to the Act totalled in excess of $800,-000,000. *See generally* Pierce, *The Work of the Indian Claims Commission*, 63 A.B.A.J. 227, 229

(1977), *cited in* F. Cohen, *supra* note 5, at 564 n. 18.

13. Act of Oct. 8, 1976, Pub.L. No. 94–465, § 2, 90 Stat. 1990 (codified as amended 25 U.S.C. § 70v–3) (Supp. V 1981). For examples of transferred cases, see Order Certifying and Transferring Cases, 39 Ind.Cl.Comm. 239 (1976); Order Certifying and Transferring Cases, 39 Ind. Cl.Comm. 261 (1976). *See generally* United States Indian Claims Commission, *Final Report* (1978), *cited in* F. Cohen, *supra* note 5, at 564 n. 21.

Tribe did in fact hold aboriginal title to most of the forty million acres claimed, that this land had been ceded to the United States under the 1868 Treaty, and that the Tribe was entitled to just compensation. *Navajo Tribe of Indians v. United States,* 23 Ind.Cl.Comm. 244, 254–55 (1970). On September 18, 1981, the United States Court of Claims entered final judgment, awarding the Tribe $14.8 million for the loss of its land. Order, record, vol. 1, at 90–91.[14]

Thereafter, the Tribe brought this action on October 6, 1982, in federal district court seeking primarily a declaratory judgment that the Tribe has equitable title to the unallotted lands that were added to the Navajo Reservation by Executive Orders Number 709 and 744[15] and that the United States breached its fiduciary duty to the Tribe by restoring such lands to the public domain in Executive Orders Number 1000 and 1284. The essence of the Tribe's complaint is that the Executive Orders were null and void, because they violated the prerequisite established by section 25 of the Act of May 29, 1908, for returning the unallotted land to the public domain—that all Navajos first be granted an allotment. The Executive Orders were, therefore, ineffective to disestablish the Executive Order reservation. On this basis, the complaint attacked the validity of all subsequent patents issued by the United States. The complaint named as defendants the United States in its capacity as "guardian and trustee of the Navajo Indians," the State of New Mexico, and various private and corporate landowners who claim current title to these lands by virtue of patents issued by the Federal Government.[16] In addition to declaratory relief, the complaint seeks mesne profits and restitution of all rents, profits, and other income derived from the defendants' use of the land to which the Tribe claims title.

Upon consideration of motions to dismiss of all defendants, the district court held that

[t]he Tribe's claims against the United States accrued prior to 1946 and fell within the exclusive jurisdiction of the Indian Claims Commission. Having failed to pursue the exclusive remedy available under the ICCA within the time prescribed in § 70k of the Act, the Tribe may not now seek relief in this Court.

Memorandum Opinion & Order, record, vol. 1, at 420. With respect to the remaining defendants, the district court held that, under Rule 19(b) of the Federal Rules of Civil Procedure, the action could not proceed against

---

**14.** Various defendants asserted below that since the Tribe fully litigated its claim to its aboriginal lands taken by the Treaty of 1868, and such lands included those involved in the present litigation, the doctrine of res judicata should preclude this litigation. We agree with the Indian Claims Commission in *The Confederated Tribes of the Colville Reservation v. United States,* 25 Ind.Cl.Comm. 99 (1971), dealing with an analogous situation with respect to the Nez Perce Tribe. That case held that prior compensation under the ICCA

for the diminution of the tribe's 1855 treaty reservation by the 1863 treaty does not defeat their claim here because the Government twice granted the land (by the Treaty of 1855 and by the Executive Order of 1873) and twice reacquired it (by the Treaty of 1863 and by the Executive Order of 1875). The two are therefore separate claims....

*Id.* at 113. In this case, the Treaty of 1868 constituted one taking from the Tribe. Some of those lands were reacquired by the Tribe through Executive Orders Number 709 and 744. The United States alleges these lands were taken

again through Executive Orders Number 1000 and 1284. Thus, the Tribe has two, separate causes of action, and the second is not precluded because of prior compensation for the first.

**15.** Though designated in the complaint as an action in ejectment, the Tribe's appellate briefs describe this lawsuit as an action to quiet title. Since there is no allegation that the Tribe is currently in possession of the lands that are the subject of this controversy, the Tribe has an adequate remedy at law in ejectment, and an action to quiet title will not lie. *Whitehead v. Shattuck,* 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873 (1891); *Fort Mojave Tribe v. Lafollette,* 478 F.2d 1016, 1018 n. 3 (9th Cir.1973); *see also* D. Dobbs, *Handbook on the Law of Remedies* 230 (1973). Though described in the briefs as an action to quiet title, the complaint properly described this action as a suit in ejectment.

**16.** The complaint sought certification of a defendant class and realignment of the United States as a plaintiff. Neither certification nor realignment was granted.

them in the absence of the United States as grantor of the patents through which those defendants derive title.

Thereafter, the Tribe moved the court under Fed.R.Civ.P. 60(b) to vacate its order dismissing the suit or, alternatively, to modify its order to permit the Tribe to amend its complaint to allege proper jurisdiction in light of the Supreme Court's intervening decision in *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). The district court denied the Tribe's motion, stating that the facts and procedural posture of *Solem* were too remote from the instant case to warrant reconsideration of the court's order.

On this appeal, the Tribe contends that the district court erred in holding that the Tribe's cause of action against the United States was a "claim" within the exclusive jurisdiction of the Indian Claims Commission. Furthermore, because the claim accrued before 1946, it was time-barred. Specifically, the Tribe argues that its claim for relief is predicated on the congressional ratification contained in section 25 of the Act of May 29, 1908, of the Tribe's title to land reserved to it under Executive Orders Number 709 and 744. That title, the Tribe maintains, has never been extinguished. The Tribe interprets the word "claim" within the meaning of the ICCA to mean exclusively a demand for money for land, the Indian title to which has concededly been extinguished. The Tribe submits that, because the Commission was only authorized to award money damages for the extinguishment of title to Indian lands, this suit, which seeks to establish the Tribe's existing title to land, could not have been entertained before the Commission. The Tribe challenges not only the dismissal of the claim against the United States, but also the dismissal of the claims against the State of New Mexico as well as the named private defendants. It also appeals the district court's denial of its motion to vacate under Rule 60(b) of the Federal Rules of Civil Procedure.

## IV.

In dismissing the complaint against the United States for lack of subject-matter jurisdiction, the district court relied chiefly on *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States*, 650 F.2d 140 (8th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982) [*Oglala* I] and *Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407 (8th Cir.1983) [*Oglala* II]. In *Oglala I*, the Indian tribe brought an action to quiet title to the Black Hills of South Dakota in federal district court, alleging an unconstitutional taking under the fifth amendment. The alleged taking arose from an 1877 statute which abrogated a treaty between the United States and the Sioux Nation. Contending that the 1877 statute violated the fifth amendment, the Tribe sought restoration of its territorial rights to the land, as well as damages resulting from waste, severance of minerals, and wrongful exclusion from the territory. The quiet title suit was filed within six months of Supreme Court affirmance of a $17.1 million ICCA award to the Sioux Nation for the Black Hills taking. *See Sioux Nation of Indians v. United States*, 220 Ct.Cl. 442, 601 F.2d 1157 (1979), *aff'd*, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The Oglala Tribe moved for a temporary restraining order preventing tender by the United States of any part of the *Sioux Nation* award. *Oglala* I, 650 F.2d at 142. Apparently, the Tribe preferred to "keep" its land rather than accept a money judgment for it.

The district court dismissed the Oglala's action against the United States for lack of subject-matter jurisdiction and dismissed the action against the private defendants after concluding that the United States was an indispensable party. The Eighth Circuit affirmed, holding that the exclusive remedy provided by the ICCA negated an implied cause of action arising under the Constitution for the taking of Indian lands by the United States. *Id.* at 143; *see also Carlson v. Green*, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980)

(when Congress provides *substitute* remedy for recovery directly under the Constitution, no *Bivens* action will lie). Recognizing that the Indian Claims Commission limited its remedial jurisdiction to the award of money damages, the Eighth Circuit nonetheless determined that the Oglala's action to quiet title, "as an Indian claim accruing before 1946 and arising under the constitution, [came] within [the] exclusive jurisdiction of the Indian Claims Commission." 650 F.2d at 143. In *Oglala* II, suit against one of the private defendants named in *Oglala* I was dismissed on the basis of res judicata. *Oglala* II, 722 F.2d at 1411.

The Tribe argues that the district court's reliance on *Oglala* I is misplaced. The Tribe concedes that *Oglala* I was correctly decided but attempts to distinguish it on the basis that the claim in *Oglala* I was predicated on an unconstitutional taking for which the Oglalas had already received compensation under the ICCA. The Navajo Tribe maintains in this case that its title was never extinguished and, therefore, its cause of action does not arise from an unconstitutional taking.[17] Instead it arises from "the Congressional ratification of the E.O. 709/744 reservation on May 29, 1908, on the conditions set by Congress to be met before lands within the 1908 reservation could be returned to the public domain, and upon the fact that such conditions have never been met." Reply Brief of Navajo Tribe of Indians at 4.

We need not decide, however, whether the Eighth Circuit's decision in *Oglala* I is persuasive reasoning for affirming the dis-trict court's dismissal in this case. Independent analysis dictates that the Tribe's claim (1) was cognizable, and exclusively so, under the ICCA; (2) was compensable only by money damages, notwithstanding the Tribe's request to quiet title; (3) accrued when Executive Orders Number 1000 and 1284 were issued; and (4) thus is time-barred under section 12 of the ICCA. We therefore affirm the trial court's holding that it lacked subject-matter jurisdiction to entertain the suit against the United States and affirm its consequent dismissal.

V.

The Tribe's assertion that the Indian Claims Commission was only empowered to hear controversies involving a "taking" of land, where Indian title was concededly extinguished, entails far too restrictive an interpretation of the word "claim" under the ICCA. The statute's purpose, explicit provisions, and legislative history belie such a narrow construction. The "chief purpose of the [ICCA was] to dispose of the Indian Claims problem with finality." *United States v. Dann*, 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985) (quoting H.R.Rep. No. 1466, 79th Cong., 1st Sess. 10 (1945)). Congress recognized that "Indian claims against the Federal Government are, by and large, about as varied in their nature and origin as are the claims of any other citizens or corporations which have had dealings with the Government." H.R.Rep. No. 1466, 79th Cong., 2d Sess. 1350 (1945). Concerned that some meritorious claim might inadvertently be

---

**17.** The Tribe does state in its reply brief that "the Navajo Tribe does not assert an implied cause of action under the Constitution for a wrongful taking by the United States." Reply Brief of Navajo Tribe of Indians at 4. Although it is reasonably clear to us why the Tribe does not wish to characterize this suit as an action arising under the Constitution in light of the holding in *Oglala* I, the complaint states:

This case arises under [the] *Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution,* the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (1842), the First Treaty with the Navajo Tribe, 9 Stat. 974 (1849), and the Second Treaty with the Navajo

Tribe, 15 Stat. 607 (1868); Section 17 of the Act of September 9, 1850, ch. 49., 9 Stat. 452; Rev.Stat. § 1979 (2d ed. 1878), now 42 U.S.C. § 1983; Rev.Stat. § 2116 (2d ed. 1878), now 25 U.S.C. § 177; Section 25 of the Act of May 29, 1908, ch. 216, 35 Stat. 457; Section 2 of the Act of June 20, 1910, ch. 310, 36 Stat. 558–59; 28 U.S.C. §§ 2201 and 2202.

Record, vol. 1, at 1–2 (emphasis added). Nevertheless, we will indulge in the usual solicitude in examining the sufficiency of complaints and construe this complaint as attempting to allege a claim independent of an implied one arising under the Constitution.

omitted from the Commission's jurisdiction, the House Committee on Indian Affairs recommended that the grant of jurisdiction to the Commission be as broad as possible:

> The bill would establish ... a body, responsible to the Court of Claims and the Supreme Court of the United States with respect to all legal controversies. It would require *all pending Indian claims of whatever nature, contractual and noncontractual, legal and nonlegal, to be submitted to this fact-finding body within 5 years, and would outlaw claims not so submitted.*

> \* \* \* \* \* \*

> In order that the decisions reached under the proposed legislation shall have finality, it is essential that the jurisdiction to hear claims which is vested in the Commission be broad enough to include *all possible claims.* If any class of claims is omitted, we may be sure that sooner or later that omission will lead to appeals for new special jurisdictional acts.... Accordingly, your committee has thought it wise to be most explicit in setting out all the classes of cases—even though they may be mutually overlapping—which have heretofore received congressional consideration in the form of special jurisdictional acts.

*Id.* at 1349, 1356 (emphasis added). It was the Committee's "unanimous opinion ... that the jurisdiction of the Commission ought to be broad enough so that no tribe could come back to Congress ten years from now and say that it had a meritorious claim which the Claims Commission was not authorized to consider." 92 Cong.Rec. 5312 (1946). Consistent with the views expressed by the House Committee on Indian Affairs, the ICCA authorized the Commission to hear claims arising under five specific categories:

> The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity aris-

ing under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

ICCA § 2, 25 U.S.C. § 70a (1976).

The language is sweeping, including even claims "based upon fair and honorable dealings" which did not otherwise constitute recognized actions at law or equity. As the legislative history indicates, Congress did not enumerate the cognizable claims under the new Act to narrowly circumscribe the Commission's jurisdiction. Rather, Congress desired to finally provide a forum for the resolution of all possible accrued claims.

> Congress wished to settle all meritorious claims of long standing of Indian Tribes and bands whether those claims were of a legal or equitable nature which would have been cognizable by a court of the United States had the United States been subject to suit and the Indians able to sue, or whether those claims were of a purely moral nature *not* cognizable in courts of the United States under any existing rules of law or equity.

*Otoe & Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 131 F.Supp. 265, 275 (1955) (emphasis in original). Both

commentators and Congress recognized that many Indian claims were going unheard because of the prior practice necessitating passage of individual jurisdictional acts for each suit. The ICCA was a remedial, reform statute to address that injustice. In drafting the expansive language in section 2, Congress wanted to avoid just what the Tribe maintains here—that "it had a meritorious claim which the Claims Commission was not authorized to consider." 92 Cong.Rec. 5312 (1946).

We do not dispute that a frequent claim brought under the ICCA involved a taking of a land interest for less than adequate compensation. This tendency, however, in no way means that it was the sole land-interest claim within the Commission's jurisdiction. The classes of cognizable cases delineated in the Act were intended to mirror those "which have heretofore received congressional consideration in the form of special jurisdictional acts." H.R.Rep. No. 1466, 79th Cong., 2d Sess. 1356 (1945). Congress determined that the ICCA should supplant the prior practice of enacting special jurisdictional legislation. Thus, the character of cases brought under such legislation, indicative of the type of case envisioned to be brought before the new Commission so that individual jurisdictional acts would no longer be necessary, is very telling as to the dimensions of the Commission's ability to hear a particular controversy.

In *Yankton Sioux Tribe of Indians v. United States*, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), the Tribe sought clarification of its asserted title to lands—not compensation for a taking of lands, Indian title to which had been concededly extinguished. Congress obliged by providing jurisdiction in the Court of Claims "to hear, and report a finding of fact, as between the United States and the Yankton tribe of Indians of South Dakota as to the interest, title, ownership and right of possession of said tribe" to a certain tract of land. *Id.* at 352, 47 S.Ct. at 142. The act clearly granted jurisdiction to litigate just what the Navajo Tribe would like to litigate in this case—the validity of Indian title to land.

Pursuant to an 1858 Treaty, the Yankton Band of Santee Sioux Indians ceded lands to the United States. In partial consideration therefore, the United States agreed that

> [t]he said Yancton Indians shall be secured in the free and unrestricted use of the Red Pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes; and the United States hereby stipulate and agree to cause to be surveyed and marked so much thereof as shall be necessary and proper for that purpose, and retain the same and keep it open and free to the Indians to visit and procure stone for pipes so long as they shall desire.

*Id.* at 353–54, 47 S.Ct. at 142. The Court found "that the Indians understood that by this provision there was granted to them full ownership of the tract; and their claim to that effect they have always persistently and stoutly maintained." *Id.* at 354, 47 S.Ct. at 142. Because the Government vacillated regarding the validity of that "claim," *id.*, it eventually entered into a second treaty with the Tribe under which Tribe title to the subject lands would be conceded "[i]f the Secretary of the Interior shall not, within one year after the ratification of this agreement by Congress, refer the question of the ownership of the said Pipestone Reservation to the Supreme Court." *Id.* at 355, 47 S.Ct. at 143. The Secretary made no attempt to refer the title question to the Court.[18] Congress thereafter recognized vested title in the Indians, evidenced by its statutory direction to the Secretary to negotiate with the Indians for the purchase of the land. *Id.* The transaction was never completed. *Id.* at 356, 47 S.Ct. at 143.

The Supreme Court found that the Tribe was, indeed, the owner "in fee." *Id.* at 359, 47 S.Ct. at 144. Nevertheless, because

---

**18.** The Secretary concluded that the Treaty provision was beyond the constitutional power of Congress and failed to pursue it. *Yankton Sioux Tribe*, 272 U.S. at 355, 47 S.Ct. at 143.

the lands had been opened to settlement and large portions of them were in the possession of innumerable innocent purchasers, *id.* at 357, 47 S.Ct. at 143, the Court ordered "just compensation *as for* a taking under the power of eminent domain." *Id.* at 359, 47 S.Ct. at 144 (emphasis added).

■ It is significant that the Court ordered monetary compensation "as for" a taking because of non-Indian settlement of the lands, even though it recognized the Indians' fee title. That decision, like the early decision that the Indian Claims Commission was only empowered to award money damages, goes to the heart of the Tribe's argument in this case. The Tribe, even if it had timely filed its claim under the ICCA, could not have quieted title in these lands or maintained an action in ejectment. However, its assertion of present title *could* have been heard before the Commission, just as the Yankton Sioux Tribe's claim was heard under an ICCA-precursor jurisdictional act. The Tribe simply would have had to accept just monetary compensation if the Commission found their claim to title valid. This restriction as to remedy represents a fundamental policy choice made by Congress out of the sheer, pragmatic necessity that, although *any* and *all* accrued claims could be heard before the Commission, land title in 1946 could not be disturbed because of the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries. Those injustices would have to be recompensed through monetary awards. As one commentator notes:

> The Indian Claims Commission Act also addressed a major collateral concern of the Congress. Prior to the Act, non-Indians who held title derived from federal patents to land claimed by Indians could not be secure in their ownership

until the Indians' claims were litigated. By authorizing the Indian Claims Commission—the only forum in which Indian claims against the United States for land they once possessed could be heard—to grant only monetary damages in satisfaction of Indian claims, non-Indians were assured of continued possession regardless of the outcome of the litigation. *Relief in the form of a declaratory judgment or injunction would have resulted in the radical remedy of dispossessing the dispossessors. By restricting the remedy, the Act forced the Indian to accept a post factum sale.*

Note, *Indian Breach of Trust Suits: Partial Justice in the Court of the Conqueror,* 33 Rutgers L.Rev. 502, 516–17 (1981) (footnotes omitted; emphasis added).

The distinction between a claim or substantive right and a remedy is fundamental. They are two, distinct concepts.

> As a matter of understanding the scope and terminology of the remedies field, it is quite important to distinguish remedy from substance. The substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the *remedial* questions whether this remedy or that is preferred, and what the measure of the remedy is.

D. Dobbs, *supra* note 15, § 1.2, at 3 (1973). The Tribe attempts to collapse these two ideas into a single jurisdictional question. It asserts that not only must the underlying legal or equitable right, duty, or obligation sued upon be within the Commission's statutory purview, but also the remedy sought or preferred must be within the Commission's power to award—else jurisdiction does not lie. We disagree. It is well within Congress' power to provide a forum in which all Indian claims could be heard but to restrict the remedy available for such claims.[19] As we interpret section

19. A very instructive example of such a power can be found in the Quiet Title Act of 1972. *See infra* discussion in text. The remedial clause of that Act, 28 U.S.C. § 2409a(b) (1982), gives the Government the option of paying just compen-

sation and thereby keeping the land even after an adverse judgment "in order to avoid disruption of ongoing federal activities involving the disputed property." *United States v. Mottaz,* —— U.S. ——, 106 S.Ct. 2224, 2232, 90 L.Ed.2d 841

2 of the ICCA, the underlying substantive claim—not the character of relief requested by the Tribe—must determine the Commission's jurisdiction. If the character of the relief sought were determinative, the ICCA's express policy of finality could be undermined by any Indian tribe that, having failed to pursue its remedy under the ICCA, now prefers the return of its lands to money damages. As the Supreme Court noted in *Block v. North Dakota*, 461 U.S. 273, 285, 103 S.Ct. 1811, 1818, 75 L.Ed.2d 840 (1983), "It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." (citation omitted).

 Moreover, *Block* makes clear that, even if we were to find that the Tribe was not limited to an action for money damages before the Indian Claims Commission, its "quiet title" action [20] could not now lie. The only statute under which the Tribe could bring a quiet title action is the Quiet Title Act of 1972, Pub.L. No. 92–562, 86 Stat. 1176 (codified at 28 U.S.C. § 2409a (1982)) (QTA), but any claim the Tribe might have under the QTA is time-barred.

In *Block*, the State of North Dakota filed suit in federal district court against several federal officials to resolve a dispute as to ownership of certain portions of riverbed under the Little Missouri River. North Dakota claimed ownership under the equal-footing doctrine which provides that a state becomes the owner of the beds of navigable streams therein upon its admission to the Union. North Dakota asserted that the Little Missouri was navigable on October 1, 1899, the date North Dakota attained statehood. The United States, on the other hand, contended that the river was never navigable, even at the time of suit. The Government had issued riverbed oil and gas leases to private entities since 1955. As the jurisdictional bases for its suit, North Dakota invoked 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); 28 U.S.C. §§ 2201–2202 (declaratory judgment and further relief); and 5 U.S.C. §§ 701–706 (judicial review provisions of the Administrative Procedure Act). *Block*, 461 U.S. at 278, 103 S.Ct. at 1815.

The Court held "that Congress intended the QTA to provide *the exclusive means* by which adverse claimants could challenge the United States' title to real property." *Id.* at 286, 103 S.Ct. at 1819 (emphasis added). The QTA governs "civil action[s] ... to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a) (1982). When the Act was debated in Congress, the Department of Justice opposed a "grandfather clause" in the Senate-passed version "that would have allowed old claims to be asserted for two years after the bill became law." *Block*, 461 U.S. at 284, 103 S.Ct. at 1818. It advocated that the legislation have prospective effect only—"that is, it would not apply to claims that accrued prior to the date of enactment." *Id.* at 283, 103 S.Ct. at 1817. As a bargaining chip, the Department offered to abandon its insistence on "prospective only" language and to accept an increase in the statute of limitations period from the proposed six years to twelve years in exchange for deletion of the grandfather clause. This package, which had the effect of making the legislation retroactive for a twelve-year period, was enacted into law. *Id.* at 284, 103 S.Ct. at 1818. Because North Dakota had notice of the United States' claim more than twelve years before the commencement of the suit, the Court found its suit to be time-barred under the QTA.[21] Furthermore, the QTA, as the State's legally exclu-

---

(1986). Moreover, a unanimous Supreme Court held that the Quiet Title Act expressly gives the choice of remedy to the Government, not the claimant. *Id.* We conclude that the ICCA similarly consigned the choice of remedy to the Government, and the Government chose money damages as the exclusive remedy.

**20.** *See supra* note 15.

**21.** Actually, the Court remanded the case to the district court to establish the date on which North Dakota's claim accrued. *Block,* 461 U.S. at 293, 103 S.Ct. at 1823. For ease of discussion, we refer to the State's claim as time-barred.

sive jurisdictional basis, could not be circumvented by attempting to sue federal officials charged with supervising the disputed area or attempting to establish jurisdiction under alternative statutes. Otherwise, the QTA's twelve-year statute of limitations "could be avoided, and, contrary to the wish of Congress, an unlimited number of suits involving stale claims might be instituted." *Id.* at 285, 103 S.Ct. at 1818.

The doctrine of sovereign immunity prior to the QTA and the QTA's twelve-year statute of limitations, taken together, totally deprived the State of North Dakota of a forum to litigate title to the riverbed—no matter when it may have tried to sue. The Court found nothing objectionable in this, because "[t]he legislative history is clear that Congress intended to foreclose *totally* any suit on claims that accrued more than 12 years prior to the effective date of the QTA." *Id.* at 286 n. 23, 103 S.Ct. at 1819 n. 23 (emphasis added).

The Tribe cannot argue that its claim falls within the QTA's exemption for "trust or restricted Indian lands," 28 U.S.C. § 2409a(a) (1982), thus perhaps opening possibilities for suit under other statutes. The Supreme Court has recently held that this exemption "operates solely to retain the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians." *United States v. Mottaz*, — U.S. —, 106 S.Ct. 2224, 2230, 90 L.Ed.2d 841 (1986). The plaintiff in *Mottaz* was an Indian essentially attempting to quiet title in land allotted to her ancestors but subsequently sold by the Government. Because she failed to bring the action within twelve years of her claim's accrual, she attempted to avoid the strictures of the QTA by pleading jurisdiction under other statutes. The Court found that the Indian land exemption of the QTA was inapplicable and that, therefore, plaintiff's exclusive jurisdictional basis was under the QTA. Hence, her case was time-barred.

The Tribe, therefore, gains nothing in attempting to characterize its claim as an action to quiet title. The Tribe, like North Dakota and Ms. Mottaz, had notice of the United States' claim more than twelve years prior to the commencement of this action and, thus, like North Dakota and Ms. Mottaz, is barred from bringing a suit to quiet title. Because the QTA is "the exclusive means by which adverse claimants [may] challenge title to real property," *see supra*, the Tribe's recitation of other statutes that purport to grant jurisdiction is irrelevant.[22] The Tribe cannot bring a quiet title action for these lands against the Government.

■ The Tribe asserts that affirming dismissal in this case would be tantamount to finding that the ICCA "extinguished by implication valid Indian titles" and that such a finding constitutes "a backhanded assertion of eminent domain powers." Brief of Navajo Tribe of Indians at 27. This view blurs the critical distinction between being unilaterally deprived of title without being given any opportunity to litigate it and being foreclosed from litigating that title because of sleeping on one's claim. The ICCA did *not* backhandedly extinguish valid Indian titles; it provided the long-overdue opportunity to litigate the *validity* of such titles and to be recompensed for Government actions inconsistent with those titles. The Tribe was unambiguously given a five-year period to assert its title to these lands "or forever hold [its] peace." 92 Cong.Rec. 5313 (1946). The pre–1946 actions of the Government in ostensibly returning the lands to the public domain and in issuing land patents to such land certainly should have alerted the Tribe to its responsibility to timely bring suit to settle the conflicting claims. The Tribe was put on clear notice that any claim not properly presented to the Commission could not "thereafter be submitted to any court or administrative agency ... nor ... entertained by the Congress." ICCA, § 12,

---

**22.** The Tribe alleged that jurisdiction was proper under 28 U.S.C. §§ 1331(a), 1343(3) and (4), 1353, and 1362. Complaint, record, vol. 1, at 1.

25 U.S.C. § 70k (1976). By sleeping on its claim, the Tribe simply lost its forum to litigate the pre–1946 actions of the Government that were inconsistent with its alleged title. "When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." *Block*, 461 U.S. at 287, 103 S.Ct. at 1819.

In *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945), the Supreme Court considered at length the conceptual difficulties inherent in statutes of limitations, creatures similar to the ICCA's five-year filing period, and yet found them to be justifiable:

> Statutes of limitations always have vexed the philosophical mind for it is difficult to fit them into a completely logical and symmetrical system of law. There has been controversy as to their effect. Some are of opinion that like the analogous civil law doctrine of prescription limitations statutes should be viewed as extinguishing the claim and destroying the right itself. Admittedly it is troublesome to sustain as a "right" a claim that can find no remedy for its invasion. On the other hand, some common-law courts have regarded true statutes of limitation as doing no more than to cut off resort to the courts for enforcement of a claim. We do not need to settle these arguments.
>
> Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims.... They represent a public policy about the privilege to litigate....
>
> This Court [has] adopted as a working hypothesis, as a matter of constitutional law, the view that statutes of limitation go to matters of remedy, not to destruction of fundamental rights.

*Id.* at 313–14, 65 S.Ct. at 1142 (citations and footnote omitted).

The Tribe apparently argues that time bars to bringing suit somehow stand on a different footing when land is involved and the plaintiff alleges present, valid title. It maintains, in essence, that it should be able to litigate a claim of title to land, no matter how much time has passed since the occurrence of the initial actions blatantly inconsistent with that title. The Supreme Court, however, perceives no such distinction. In *Block*, the state claimed valid legal title to the riverbed but was denied a forum, even though it was thereby effectively, if not legally, stripped of its alleged title. Plaintiff, in *Mottaz*, was similarly refused a forum and effectively deprived of her alleged title, and her own description of her claim closely parallels that of the Tribe's in this case:

> At no time in this proceeding did [Ms. Mottaz] drop her claim for title. To the contrary, the claim for title is the essence and bottom line of [her] case. Her position is simply that the land remains in the name of Mottaz and the other heirs of the property despite what some pieces of paper executed by [the Government] without her consent and without a court hearing purport to do.

*Mottaz*, 106 S.Ct. at 2229 (quoting Brief for Respondent). In denying her a forum to litigate her title against the United States because of her failure to promptly file her claim within the limitations period, the Court found no "backhanded assertion of eminent domain powers." We find that, just as with the QTA, "[t]he limitations provision of the [ICCA] reflects a clear congressional judgment that the national public interest requires barring stale challenges to the United States' claim to real property, whatever the merits of those challenges." *Id.* at 2234.

■ In sum, the underlying claim in this case—that the Tribe has present, legal title to the lands granted under Executive Orders Number 709 and 744 and confirmed in the Act of May 29, 1908—accrued in 1908 and 1911 when Executive Orders Number 1000 and 1284 were issued, respectively, or at least when the Tribe learned of the President's actions. These latter Executive Orders, and the subsequent land patents issued to New Mexico and the other defendants' predecessors in interest, whether

valid or not, were inconsistent with the Indians' claim of title to these lands. The Tribe simply cannot pretend that the issuance of both the Executive Orders and land patents never occurred, so that no claim against the United States arose before it decided to bring suit in 1982. Had a forum been available to it, the Tribe could have sued the United States in 1908 and 1911 for ostensibly restoring lands to the public domain and thereafter granting patents in such lands that, in fact, may have belonged to the Tribe.

The Tribe's claim was one "arising under ... Executive Orders of the President" under section 2 of the ICCA and therefore one within the jurisdiction of the Commission, since both the alleged receipt of title to the subject lands and the Government's action inconsistent with that title arose pursuant to Executive Orders. Because these claims clearly accrued before 1946, the Tribe had until 1951 to assert them before the Commission, where it would have been limited to monetary recovery if its claims were found valid.[23]

## VI.

■ The Tribe also appeals the district court's holding that "the claims against the remaining defendants must be dismissed pursuant to Fed.R.Civ.P. 19(b),[24] since the United States is an indispensable party which cannot be joined and without which the action cannot proceed in equity and good conscience." Memorandum Opinion & Order, record, vol. 1, at 421. Since evaluation of indispensability "depends to a large degree on the careful exercise of discretion by the district court," *Glenny v. American Metal Climax, Inc.,* 494 F.2d 651, 653 (10th Cir.1974), we will only reverse a district court's determination for abuse of that discretion. Finding no such abuse, we affirm the district court's dismissals.

We adopt the trial court's reasoning as dispositive:

The Tribe's claims against the remaining defendants are, in reality, challenges to the validity of the transactions by which the United States assumed title to the subject land. Specifically, the Tribe seeks to cancel and set aside all patents, grants, assignments, leases, and other conveyances made or done pursuant to § 25 of the Act of May 25, 1908, and any Executive Order promulgated thereunder. Plaintiff's Complaint at 13, ¶ d.

---

**23.** It is well-established that Indian Tribes had a compensable claim under the ICCA for the taking of Executive Order reservations. *See, e.g., Northern Paiute Nation v. United States,* 225 Ct.Cl. 275, 634 F.2d 594, 601 (1980) (per curiam); *The Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 390 F.2d 686, 696–97 (1968); *Confederated Tribes of the Colville Reservation v. United States,* 25 Ind.Cl.Comm. 99, 113 (1971). Although the Tribe does not allege a "taking," the Commission could have awarded just compensation "as for" a taking under the reasoning of *Yankton Sioux Tribe* if it had found valid title to lie in the Tribe.

**24.** Fed.R.Civ.P. 19(b) provides:

If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Although the trial court did not expressly find that the United States was "a person described in subdivision (a)(1)–(2) hereof," we conclude that the Government "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [its] absence may (i) as a practical matter impair or impede [its] ability to protect that interest...." Fed.R. Civ.P. 19(a)(2)(i). The Government continues to assert title to substantial portions of the reservation created by Executive Orders Number 709 and 744. A finding in a suit against the other defendants that title to the entire reservation is vested in the Tribe under its theory that Executive Orders Number 1000 and 1284 were null and void would impair the Government's "ability to protect that interest."

"It is a fundamental principle of the law that an instrument may not be cancelled by a Court unless the parties to the instrument are before the Court." *Tewa Tesuque v. Morton,* 360 F.Supp. 452 (D.N.M.1973), *aff'd,* 498 F.2d 240 (10th Cir.1974). Moreover, "as a matter of federal law, it is well established that the validity of a deed or patent from the federal government may not be questioned in a suit brought by a third party against the grantee or patentee." *Raypath, Inc. v. City of Anchorage,* 544 F.2d 1019, 1021 (9th Cir.1977). In addition, a tribe may not avoid the exclusivity bar of § 70k of the Indian Claims Commission Act by seeking title, possession and damages from successors in interest of the United States, where suit against the federal government is barred. *Oglala II....*

Memorandum Opinion & Order, record, vol. 1, at 420–21.

The Tribe argues, first, that the lower court failed to properly make a particularized inquiry under Rule 19(b). It maintains that we should, therefore, remand for sufficient analysis of its reason for finding indispensability, citing our decision in *Wright v. First National Bank,* 483 F.2d 73 (10th Cir.1973). In that case, however, the trial court's single, conclusory statement was that "complete relief cannot be afforded the remaining parties for all the reasons set out in Rule 19, FRCP; that Plaintiffs have an adequate remedy in State Court upon the dismissal of the Petition in this case." *Id.* at 75. We remanded because the court "made no determination whether 'in equity and good conscience' the case could proceed" and cited no facts to

support its conclusion of indispensability. *Id.* In this case, the quoted passages above from the trial court's opinion evince sufficient facts and analysis to buttress its holding, including: (1) that the claims against the non-federal parties rested on documents of title or possession derived from the United States; (2) that the Tribe seeks to cancel all such instruments; (3) that this court has affirmed the principle that all parties to an instrument must be present, else it may not be cancelled; (4) that, more specifically, validity of a deed or patent issued by the Federal Government cannot be questioned in suit by a third party against the grantee; and (5) that the Eighth Circuit has found indispensability in analogous circumstances.

A brief review of the four factors listed in Rule 19(b) to be considered when deciding indispensability, *see supra* note 24, confirms the district court's disposition. The first factor is the extent to which a judgment rendered in the United States' absence might be prejudicial to it or those already parties. Because prejudice to the United States is clear, we need not consider any possible prejudice to the other parties. A finding in the Government's absence that title to the reservation created by Executive Orders Number 709 and 744 is vested in the Tribe when the United States claims title to much of that land undoubtedly prejudices the latter's interests.[25] Second, such prejudice could not be lessened or avoided either through protective provisions in the judgment or through the shaping of relief. Title to the Executive Order reservation must be decided entirely or not at all. Third, in light of the large holdings

---

**25.** To argue, as the Tribe does, that the United States can protect its interest through voluntary intervention would render Rule 19(b) almost completely nugatory. A party satisfying Rule 19(a)(2)(i), and yet not joined, thus requiring a Rule 19(b) analysis, would *always* satisfy the prerequisites for intervention as of right under Fed.R.Civ.P. 24(a), which, in part, allows intervention

when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a prac-

tical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Under the Tribe's argument, a court could *never* find a Rule 19(a)(2)(i) party indispensable under Rule 19(b), because such a party could always protect his interest by intervening. The purpose of Rule 19, however, is not to exhort an interested person to exercise its Rule 24 rights. We decline to adopt an interpretation of Rules 19(a)(2)(i) and 19(b) that completely emasculates them of any meaning.

of land claimed by the United States in this case,[26] a judgment rendered in its absence would not be adequate.

The fourth factor to consider is whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. We concede that the Tribe has no such remedy. Yet, this lack does not preclude a finding of indispensability in this case. "Rule 19(b) does not state what weight is to be given each factor, and thus we must determine the importance of each factor on the facts of each particular case and in light of equitable considerations." *Glenny*, 494 F.2d at 653. A finding here that the United States is not an indispensable party would allow a tribe to avoid the admittedly catastrophic effects under the ICCA of sleeping on its pre-1946 claim by simply waiting until the United States transfers title and then bringing suit against the successors in interest to the United States—even though suit against the United States itself is barred. That would undermine the very intricate and exclusive remedial scheme that Congress created in the ICCA. As discussed earlier, one of the very reasons the Commission was only empowered to award money damages was so that interests of innocent, third-party grantees would not now be disturbed. We agree with the district court that "in equity and good conscience," the action should not proceed.

The Tribe asserts, alternatively, that precedent requires a finding that the United States is not an indispensable party. The authorities cited by the Tribe for this proposition are inapposite. *See Choctaw & Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir.1951), *cert. denied*, 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332 (1952); *Idaho v. Andrus*, 720 F.2d 1461 (9th Cir.1983); *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984); *Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp.*, 418 F.Supp. 798 (D.R.I.1976); 3A *Moore's Federal Practice* ¶ 19,09[8], at 19–195 (2d ed. 1986) ("Nor need the United States be joined in an action against third persons by certain Indian nations to establish title to and to recover possession of land constituting part of the unallotted common domain of the nations...."). *But see id.* at 19–196 ("But in general the United States is an indispensable party in actions involving Indian lands because of its governmental interest....").

In *Choctaw, Puyallup,* and *Narragansett*, the interest of the United States was aligned with that of the Indians. The Government was the putative fee owner of the trust lands in which the Indians asserted beneficial ownership in a suit strictly against third parties. As the putative fee owner, the Government certainly had an interest in the litigation but, understandably, was not found indispensable when the third parties sought dismissal for nonjoinder. In *Andrus*, the interests of the United States and the Indians were also mutual.

The posture of this case is quite different. The Tribe and the United States are adversaries, each claiming sole title to the same land. Unlike in the above cases, the United States and the Tribe are not aligned together against the countervailing interests of third parties. We do not, therefore, find the above authorities persuasive in the present case.

## VII.

█ Finally, the Tribe appeals the district court's denial of its motion under Fed. R.Civ.P. 60(b)[27] to vacate its order of dis-

---

**26.** With respect merely to the New Mexico portion of the subject lands, 23% is currently U.S. Bureau of Land Management Lands. This figure excludes National Parks and Monuments, U.S. Bureau of Reclamation lands, and lands held in trust for Indian use. Affidavit of Alfred Dehiya, record, supp. vol. 2, exhibit D.

**27.** Fed.R.Civ.P. 60(b) provides in pertinent part: On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discov-

missal or, in the alternative, to modify that order to permit the Tribe to amend its complaint to properly allege jurisdiction. A district court's denial of a motion under Rule 60(b) may not be disturbed absent an abuse of discretion. *See, e.g., Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1181 (10th Cir.1983); *Adams v. J.W. Jones Constr. Co.,* 703 F.2d 483, 484 n. 2 (10th Cir.1983); *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795, 799 (10th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980); *V.T.A., Inc. v. Airco, Inc.,* 597 F.2d 220, 223 (10th Cir.1979).

The Tribe relies chiefly [28] on the intervening Supreme Court decision in *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). The district court found "nothing in the *Solem* decision to suggest that its dismissal of this lawsuit was erroneous, nor to support the Tribe's assertion that, given leave to amend, it could properly allege federal court jurisdiction." Memorandum Opinion & Order, record, supp. vol. 1, at 19. We agree.

In *Solem,* the defendant, an enrolled member of the Cheyenne River Sioux Tribe, pleaded guilty in a state court in South Dakota to the charge of attempted rape. The United States District Court for the District of South Dakota granted Mr. Bartlett's petition for a writ of habeas cor-

pus, reasoning that the state court lacked criminal jurisdiction to try the defendant because his crime was committed within "Indian country" on land that was part of the Cheyenne River Reservation. *See* 18 U.S.C. §§ 1151(a), 1153 (1982 & Supp. III 1985). The Eighth Circuit Court of Appeals affirmed.

In order to determine whether the situs of the attempted rape was within Indian country, the Supreme Court necessarily had to decide whether Congress, by opening up 1.6 million acres of the Cheyenne River Sioux Reservation for homesteading in a 1908 surplus land act, thereby diminished the boundaries of the reservation or simply permitted non-Indians to settle within existing reservation boundaries. After a detailed statutory analysis, the Court concluded that Congress did not intend to diminish the reservation by the 1908 Act and that, therefore, Mr. Bartlett's crime did occur within Indian country, thus affirming the issuance of the writ. *Solem,* 465 U.S. at 481, 104 S.Ct. at 1171.

The district court found that "[w]hile *Solem* may well be relevant and significant authority with respect to the *merits* of the Tribe's claim, [the district court lacks] subject matter jurisdiction to consider the merits, and neither *Solem* nor the Tribe's memorandum in support of [its] motion provide authority for the exercise of such jurisdic-

---

ered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

**28.** The Tribe also discusses three additional decisions issued after the briefing on the Tribe's Rule 60(b) motion to vacate was completed and before the decision denying the motion. These, as *Solem,* fail to supply authority directed toward curing the fatal jurisdictional defect in this case. None of these cases was brought to validate present title to land as against the Government. In none could title have been confirmed in the Indians.

In *United States v. Dann,* 706 F.2d 919 (9th Cir.1983), *rev'd,* 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985), Indians, who allegedly grazed their cattle on public land without a permit, defended against a trespass action through claiming aboriginal title to the land. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341 (7th Cir.), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983), was a declaratory judgment action determining whether the Indians' treaty-reserved, off-reservation, hunting, fishing, trapping, and gathering rights (collectively termed "usufructuary rights") on public lands remained extant (thus precluding state regulation thereof) or were extinguished or released. *Swim v. Bergland,* 696 F.2d 712 (9th Cir.1983), was a declaratory judgment action to determine Indian grazing rights on lands ceded to the Federal Government.

tion." Memorandum Opinion & Order, record, supp. vol. 1, at 20 (emphasis in original). We agree that *Solem* fails to constitute authority providing subject-matter jurisdiction in this case to adjudicate title to the lands in question. We do not, however, necessarily agree with the district court that *Solem* would be "relevant and significant authority" if title to these lands could now be adjudicated.

Both of these positions stem from the fact that adjudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands.[29] One inquiry does not necessarily have anything in common with the other, as "title and reservation status are not congruent concepts" in Indian law. *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1097 (10th Cir.1985) (en banc) (Seymour, J., concurring), *cert. denied*, —— U.S. ——, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). In fact, "allotment in severalty to individual Indians and subsequent entry by non-Indians is entirely consistent with continued reservation status." *Id.* at 1094 (citing *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)). *Solem,* as well as its predecessor cases,[30] merely analyzed the continued reservation status of certain lands for purposes of unraveling state, federal, and tribal sovereignty over those lands. The Court noted that "[t]he modern legacy of the surplus land acts has been a spate of *jurisdictional disputes* between state and federal officials *as to which sovereign* has authority

---

**29.** The Tribe itself fails to appreciate the discrete concepts of reservation status and land title when it states, "On the basis of judicially noticeable facts alone, the continued reservation status of [the Executive Order reservation] is almost conclusively established." Brief of Navajo Tribe of Indians at 43. If the Tribe wishes to pursue continued reservation status, as opposed to title, of the subject lands, it is not precluded from filing a declaratory judgment action to determine its reservation boundary lines, as did the Ute Tribe of Indians and the Rosebud Sioux Tribe. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986).

However, a finding in such an action that the reservation created by Executive Orders Number 709 and 744 was not disestablished by Executive Orders Number 1000 and 1284 would not accomplish what the Tribe seeks here—the quieting of title in such lands in favor of the Tribe or compensation in lieu thereof. It would merely clarify sovereignty over the lands in question. The exclusive forum to litigate its pre–1946 civil claim against the United States regarding title to the land was the Indian Claims Commission. Nothing in *Solem* dissuades us from this conclusion.

**30.** Although the Tribe refers to *Solem* as "significant new authority," Reply to Responses to Plaintiff's Motion for Relief from Order of Dismissal, record, supp. vol. 1, at 15, *Solem* is rather one of a line of cases construing the dimensions of "Indian country." Just as in *Solem,* title to land was neither at issue nor affected in these cases.

In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 585–86, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977), the Tribe sued to obtain a declaratory judgment "that the original boundaries of their reservation ... had not been diminished by three subsequent Acts of Congress passed in 1904, 1907, and 1910 respectively." The Court affirmed the Eighth Circuit's conclusion that Congress did intend to diminish the reservation.

In *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), South Dakota courts asserted civil and criminal jurisdiction over tribe members for acts done on land allegedly within the Lake Traverse Indian Reservation. The Court held that an 1891 Act of Congress terminated the reservation, thus confirming the state courts' jurisdiction over the matters in question.

In *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), the Court determined a reservation boundary at issue in a forfeiture proceeding. A California game warden had confiscated five gill nets. The owner alleged that the confiscation occurred in Indian country, so state statutes prohibiting their use were inapplicable. The Supreme Court agreed.

*Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), was a habeas case, very similar in posture to *Solem,* requiring the determination of whether a reservation was diminished by a congressional act. The petitioner was imprisoned under a sentence for attempted burglary imposed by a state court. The petitioner maintained that the alleged offense occurred within Indian country, thus stripping the state court of criminal jurisdiction. The Court held the reservation had not been diminished and thus reversed a judgment denying the issuance of a writ of habeas corpus.

Indeed, if the Tribe itself declines to pursue a declaratory judgment action, *see supra* note 29, we would not be suprised if the status of the Executive Order reservation at issue here is litigated someday in an analogous context.

over lands that were opened by the Acts...." *Solem,* 465 U.S. at 467, 104 S.Ct. at 1164 (emphasis added). Fee title to such land was neither considered nor affected. Thus, the entire *Solem* analysis in determining whether Congress intended to disestablish or diminish the reservation in no way addresses title to the land within the putative reservation and furnishes no foundation for asserting subject-matter jurisdiction to litigate such title. *Solem,* therefore, provides no basis for granting 60(b) relief.

Similarly, *Solem* provides no reason for allowing the Tribe to file an amended complaint. Notwithstanding the Tribe's unsubstantiated assertions that "formal defects in the complaint ... could be easily remedied in an amended complaint," Reply Brief of Navajo Tribe of Indians at 22, when "it is clear that the amendment cannot cure the lack of jurisdiction," we must deny the motion to amend. *Chase Manhattan Mortgage & Realty Trust v. Pendley,* 405 F.Supp. 593, 595 (N.D.Ga.1975), *citing* 3 *Moore's Federal Practice* ¶ 15.09, at 15–98 to –99 (2d ed. 1985).

The district court's decisions are affirmed.

## EOUNDARIES OF THE NAVAJO RESERVATION
### APPENDIX
(Tribe's Complaint, Exhibit C, Record, vol. 1, at 18)

Reproduced by courtesy of Navajo
Land Investigation Department and
Navajo Tribal Council.

| | | | |
|---|---|---|---|
| **A** | Original treaty reservation. June 1, 1868. | **H** | Executive-order addition. March 10, 1905. |
| **B** | Executive-order addition. October 29, 1878. | **I** | Executive-order addition. November 9, 1907. |
| **C** | Executive-order addition. January 6, 1880. | **J** | Executive-order addition. November 9, 1907; restored to public domain by executive order of January 16, 1911. |
| **CC** | Originally a part of "C"; withdrawn from the reservation by executive order, May 17, 1884; restored by executive order, April 24, 1886. | **K** | Executive-order addition. November 9, 1907; restored to public domain by executive order of December 30, 1908. |
| **D (two parts)** | Executive-order addition. May 17, 1884. | **L** | Tusayan Forest addition. Act of May 23, 1930. |
| **E** | The Paiute Strip. Originally a part of "D"; in 1872 restored to the public domain; in 1908 withdrawn for the use of various Indians; restored to public domain in 1922; in 1929 again withdrawn from entry; 1933 transferred permanently to the Navajo reservation. | **M** | Executive-order addition. May 7, 1917. |
| | | **N** | Act of March 1, 1933. |
| | | **O (three parts)** | Arizona Boundary Act of June 14, 1934. |
| **F** | Executive-order addition. January 8, 1900. | **P** | Tusayan Forest addition. Act of February 21, 1933. |
| **G** | Executive-order addition November 14, 1901, | **Q** | Hopi reservation. Executive-order reservation created on December 16, 1882. |