# UNITED STATES *v.* DANN ET AL.

No. 83–1476.   Argued November 5, 1984—Decided February 20, 1985

BRENNAN, J., delivered the opinion for a unanimous Court.

*Assistant Attorney General McConnell* argued the cause for the United States. On the briefs were *Solicitor General Lee, Assistant Attorney General Habicht, Joshua I. Schwartz, Jacques B. Gelin, Dean K. Dunsmore,* and *Robert L. Klarquist.*

*John D. O'Connell* argued the cause and filed a brief for respondents.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether the appropriation of funds into a Treasury account pursuant to 31 U. S. C. § 724a (1976 ed., Supp. V)[1] constitutes "payment"

---

*William T. Finley, Jr.,* filed a brief for the American Land Title Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Indian Law Resource Center by *Steven M. Tullberg* and *Robert T. Coulter;* and for the Western Shoshone National Council by *Thomas E. Luebben* and *Richard W. Hughes.*

[1] The statute provided:

"There are appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary for the payment, not otherwise provided for, as certified by the Comptroller General, of final judgments, awards, and compromise settlements, which are payable in accordance with the terms of . . . awards rendered by the Indian Claims Commission . . . ."

under § 22(a) of the Indian Claims Commission Act, 60 Stat. 1055, 25 U. S. C. § 70u(a) (1976 ed.).[2]

## I

This case is an episode in a longstanding conflict between the United States and the Shoshone Tribe over title to lands in the western United States.   In 1951 certain members of the Shoshone Tribe sought compensation for the loss of aboriginal title[3] to lands located in California, Colorado, Idaho, Nevada, Utah, and Wyoming.[4]   Eleven years later, the Indian Claims Commission entered an interlocutory order holding that the aboriginal title of the Western Shoshone had been extinguished in the latter part of the 19th century,

---

[2] The statute provided:

"When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims, and there is authorized to be appropriated such sums as are necessary to pay the final determination of the Commission.

"The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy."

The Indian Claims Commission was terminated on September 30, 1978, pursuant to 25 U. S. C. § 70v (1976 ed.).

[3] For a discussion of aboriginal title, see *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 667 (1974); *Johnson* v. *McIntosh*, 8 Wheat. 543, 573–574 (1823); *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831); F. Cohen, Handbook of Federal Indian Law 486–493 (1982).   On the theoretical origins of aboriginal rights, see J. Scott, The Spanish Origin of International Law: Francisco de Vitoria and His Law of Nations (1934); Cohen, Spanish Origin of Indian Rights, 31 Geo. L. J. 1 (1942); Cohen, Original Indian Title, 32 Minn. L. Rev. 28 (1947).

[4] Section 2 of the Indian Claims Commission Act, 60 Stat. 1050, as amended, 25 U. S. C. § 70a (1976 ed.), authorized claims to be brought on behalf of "any Indian tribe, band, or other identifiable group of American Indians" for "claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant . . . ."

*Shoshone Tribe* v. *United States,* 11 Ind. Cl. Comm'n 387, 416 (1962), and later awarded the Western Shoshone in excess of $26 million in compensation. *Western Shoshone Identifiable Group* v. *United States,* 40 Ind. Cl. Comm'n 318 (1977). The Court of Claims affirmed this award.[5] *Temoak Band of Western Shoshone Indians* v. *United States,* 219 Ct. Cl. 346, 593 F. 2d 994 (1979). On December 6, 1979, the Clerk of the Court of Claims certified the Commission's award to the General Accounting Office. Pursuant to 31 U. S. C. § 724a (1976 ed., Supp. V), this certification automatically appropriated the amount of the award and deposited it for the Tribe in an interest-bearing trust account in the Treasury of the United States.

Under 25 U. S. C. § 1402(a)[6] and § 1403(a),[7] the Secretary of the Interior is required, after consulting with the Tribe, to submit to Congress within a specified period of time a plan for the distribution of the fund. In this case, the Secretary has yet to submit a plan of distribution of the $26 million owing to the refusal of the Western Shoshone to cooperate in

---

[5] Section 20(b) of the Indian Claims Commission Act, 60 Stat. 1054, as amended, 25 U. S. C. § 70s(b) (1976 ed.), provided for an appeal to the Court of Claims from any "final determination" of the Indian Claims Commission.

[6] The statute provides:

"Within one year after appropriation of funds to pay a judgment of the Indian Claims Commission . . . , the Secretary of the Interior shall prepare and submit to Congress a plan for the use and distribution of the funds."

[7] The statute provides:

"The Secretary shall prepare a plan which shall best serve the interests of all those entities and individuals entitled to receive funds of each Indian judgment. Prior to the final preparation of the plan, the Secretary shall—

"(1) receive and consider any resolution or communication, together with any suggested use or distribution plan, which any affected Indian tribe may wish to submit to him; and

"(2) hold a hearing of record, after appropriate public notice, to obtain the testimony of leaders and members of the Indian tribe which may receive any portion, or be affected by the use or distribution, of such funds . . . ."

devising the plan. The fund apparently has now grown to $43 million. Reply Brief for United States 20.

In 1974, the United States brought an action in trespass against two sisters, Mary and Carrie Dann, members of an autonomous band[8] of the Western Shoshone, alleging that the Danns, in grazing livestock without a permit from the United States, were acting in violation of regulations issued by the Secretary of the Interior under the authority of the Taylor Grazing Act, 43 U. S. C. § 315b.[9] The 5,120 acres at issue in the suit are located in the northeast corner of Nevada. In response to the United States' suit, the Danns claimed that the land has been in the possession of their family from time immemorial and that their aboriginal title to the land precluded the Government from requiring grazing permits. The United States District Court for the District of Nevada rejected the Danns' argument and ruled that aboriginal title had been extinguished by the collateral-estoppel effect of the Indian Claims Commission's judgment in 1962. *United States* v. *Mary and Carrie Dann*, Civil No. R–74–60 (Jan. 5, 1977). The Court of Appeals for the Ninth Circuit reversed and remanded, however, on the ground that "[w]hatever may have been the implicit assumptions of both the United States and the Shoshone Tribes during the

---

[8] See Steward, The Foundations of Basin-Plateau Shoshonean Society, in Languages and Cultures of Western North America 113, 115 (E. Swanson ed. 1970) (" '[B]and' can have no precise definition. Although it generally signifies cohesion and interaction between families that constitute a group of permanent membership, it may range in size from a few families that are closely related to many families which include some not related, or it may be structured on unilineal or bilateral principles, and interaction between the families may take many forms").

[9] The statute provides:

"The Secretary of the Interior is authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range, upon the payment annually of reasonable fees in each case to be fixed or determined from time to time in accordance with governing law."

litigation . . . , the extinguishment question was not necessarily in issue, it was not actually litigated, and it has not been decided." *United States* v. *Dann*, 572 F. 2d 222, 226–227 (1978).

On remand, the District Court held that aboriginal title was extinguished when the final award of the Indian Claims Commission was certified for payment on December 6, 1979. Civil No. R–74–60 (Apr. 25, 1980). On appeal, the Government defended the judgment of the District Court on the ground that the "full discharge" language of § 22(a) of the Indian Claims Commission Act, see n. 2, *supra*, precluded the Danns from raising the defense of aboriginal title. Although Congress had not yet approved a plan for the distribution of the funds to the Western Shoshone, the United States maintained that the requirement of "payment" under § 22(a) was satisfied by the congressional appropriation of the $26 million award into the Treasury account. The Danns argued that until Congress approved a plan for the distribution of the money to the Tribe, "payment" was not satisfied.

The Court of Appeals held that "payment" had not occurred within the meaning of § 22(a) and reversed the District Court. 706 F. 2d 919, 926 (1983). The court reasoned that until a plan of distribution was adopted by the Congress, there remained "significant legal blocks in the way of delivery to the payee," and thus the "ordinary meaning" of payment was not satisfied. We granted certiorari to resolve the question of whether the certification of the award and appropriation under § 724a constitutes payment under § 22(a). 467 U. S. 1214 (1984). We reverse.

II

The legislative purposes of the Indian Claims Commission Act and the principles of payment under the common law of trust as they have been applied to the context of relations between native American communities and the United States require that we hold that "payment" occurs under § 22(a) when funds are placed by the United States into an account in

the Treasury of the United States for the Tribe pursuant to 31 U. S. C. § 724a (1976 ed., Supp. V).

## A

The Indian Claims Commission Act had two purposes. The "chief purpose of the [Act was] to dispose of the Indian claims problem with finality." H. R. Rep. No. 1466, 79th Cong., 1st Sess., 10 (1945). This purpose was effected by the language of § 22(a): "When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims . . . ."[10]   Section 22(a) also states that the "payment of any claim . . . shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." To hold, as the court below has, that payment does not occur until a final plan of distribution has been approved by Congress would frustrate the purpose of finality by postponing the preclusive effects of § 22(a) while subjecting the United States to continued liability for claims and demands that "touch" the matter previously litigated and resolved by the Indian Claims Commission.

The second purpose of the Indian Claims Commission Act was to transfer from Congress to the Indian Claims Commission the responsibility for determining the merits of native American claims. In the course of hearings on the creation of the Indian Claims Commission, Congressman Henry Jackson, Chairman of the House Committee on Indian Affairs, made this clear:

---

[10] On the finality of judgments of the Court of Claims, see 28 U. S. C. § 2519 (1976 ed.) ("A final judgment of the Court of Claims against any plaintiff shall forever bar any further claim, suit, or demand against the United States arising out of the matters involved in the case or controversy"); United States v. O'Grady, 22 Wall. 641, 647 (1875); W. Cowen, P. Nichols, & M. Bennett, The United States Court of Claims, Part II, pp. 22–25 (1978).

". . . [T]he very purpose of this act, the reason we are coming to Congress, is that we are being harassed constantly by various individual pieces of legislation. I do not want to act on separate legislation and Congress is being told to act on those bills, without knowing the facts, and the purpose of this legislation will be to dispose of all those routine claims and let the commission decide what the obligation is of this Government to the Indians; and, acting upon those findings made by the Commission, Congress will appropriate the money." Hearings on H. R. 1198 and H. R. 1341 before the House Committee on Indian Affairs, 79th Cong., 1st Sess., 68 (1945).

During the floor debate on the Act, Congressman Jackson observed that the House was acting in response to a study by the Brookings Institution that had concluded that "there ought to be a prompt and final settlement of all claims between the Government and its Indian citizens, and that the best way to accomplish this purpose is to set up temporarily an Indian Claims Commission which will sift all these claims, subject to appropriate judicial review, and bring them to a conclusion once and for all." 92 Cong. Rec. 5312 (1946).

Prior to the adoption of the Indian Claims Commission Act by the House of Representatives, Attorney General Clark issued the following warning:

"The bill would provide that when the report of the Commission determining any claimant to be entitled to recover has been filed with the Congress, such report would have the effect of a final judgment to be paid in like manner as are judgments of the Court of Claims. This provision would make the Commission virtually a court with the power to determine claims based both upon legal and moral grounds rather than a fact finding body as an aid to Congress. In view of the vague basis upon which many of the claims presented to the Commission would be predicated, and the extremely novel

character of the functions delegated to the Commission, the question is raised of whether or not the recognition of the claims should not rest finally with Congress. The provision making the findings of the Commission binding upon Congress would constitute a surrender by Congress of its very necessary prerogative to sift and control this unusual type of claim against the Government." *Id.*, at 5311 (letter to Congressman John Cochran in response to his request for the Attorney General's "views with respect to the bill (H. R. 4497) to create a Indian Claims Commission." *Id.*, at 5310).

Despite this warning, the House left the language of the Act unchanged. The Senate, however, deleted from the House bill the language that Attorney General Clark asserted would give the decisions of the Indian Claims Commission the effect of a final judgment binding upon Congress. The Conference adopted the House version "in order to make perfectly clear the intention of both houses that the determinations of the Commission should, unless reversed [by the Court of Claims], have the same finality as judgments of the Court of Claims." H. R. Conf. Rep. No. 2693, 79th Cong., 2d Sess., 8 (1946). As enacted, the Indian Claims Commission Act explicitly incorporated this standard of finality in § 22(a).

The court below justified its decision on the ground that in making "payment" turn on the submission and approval of a final plan of distribution, Congress would have one last opportunity to review the merits of claims litigated before the Indian Claims Commission. 706 F. 2d, at 927. This justification for delay obviously conflicts with the purpose of relieving Congress of the burden of having to resolve these claims.

### B

Aside from its departure from the purposes of the Indian Claims Commission Act, the Court of Appeals' interpretation is in conflict with the accepted legal uses of the word "payment"—uses we assume Congress intended to adopt when it

enacted § 22(a). To accept the argument of the Court of Appeals would give the word "payment" a meaning that differs markedly from its common-law meaning, which has long been applied by this Court to the relations between native American tribes and the United States.

The common law recognizes that payment may be satisfied despite the absence of actual possession of the funds by the creditor. Funds transferred from a debtor to an agent or trustee of the creditor constitute payment, and it is of no consequence that the creditor refuses to accept the funds from the agent or the agent misappropriates the funds.[11] The rationale for this is that fiduciary obligations and the rules of agency so bind the trustee or agent to the creditor (*i. e.*, the beneficiary or principal) as to confer effective control of the funds upon the creditor.

The Court has applied these principles to relations between native American communities and the United States. In *Seminole Nation* v. *United States*, 316 U. S. 286 (1942), the United States was obligated by treaty to pay annual annuities to members of the Seminole Nation. Instead, the Government transferred the money to the Seminole General Council. Members of the Tribe argued that because the

---

[11] See G. Bogert, Law of Trusts and Trustees § 902 (2d rev. ed. 1982) (footnotes omitted) ("[I]t is now universally the law that the purchaser of trust property from the trustee . . . may pay the purchase money to the trustee without making any inquiry as to the use to which the trustee intends to put the money. The purchaser, in the absence of notice to the contrary, may safely assume that the price will be applied in an appropriate manner as trust property"); 4 A. Scott, Law of Trusts § 321 (3d ed. 1967); Stone, Some Legal Problems Involved in the Transmission of Funds, 21 Colum. L. Rev. 507 (1921). See also, the Uniform Fiduciaries Act § 2, 7A U. L. A. 135 (1978) ("A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary").

Seminole General Council had misappropriated the money, the Government had not satisfied its obligation to pay the individual members of the Tribe. In disposing of the case, the Court relied upon the rule that "a third party who pays money to a fiduciary for the benefit of the beneficiary, with knowledge that the fiduciary intends to misappropriate the money or otherwise be false to his trust, is a participant in the breach of trust and liable therefor to the beneficiary." *Id.*, at 296. The Court's holding was based on its recognition of the traditional rule that a debtor's payment to a fiduciary of the creditor satisfies the debt.[12] Absent actual knowledge of the fraudulent intent of the trustee—or some other recognized exception to the general rule—the Government's payment to the Council would have discharged its treaty obligations. *Ibid.* The order remanding the case for purposes of determining whether the Government had fraudulent intent, *id.*, at 300, would have made sense only if the Court believed that, absent such knowledge, the Government's treaty obligations were discharged.

The Court's reliance on the general rule in *Seminole Nation* is authority for our holding that the United States has made "payment" under § 22(a). The final award of the Indian Claims Commission placed the Government in a dual role with respect to the Tribe: the Government was at once a judgment debtor, owing $26 million to the Tribe, and a trustee for the Tribe responsible for ensuring that the money was put to productive use and ultimately distributed in a

---

[12] The Court's acknowledgment of this general rule is apparent from its citation to 4 G. Bogert, Law of Trusts and Trustees § 901 (1935), which stated: "It is now the law that the purchaser of trust property from the trustee, where the trustee has a power to sell and has properly executed his power, may pay the purchase money to the trustee without making any inquiry as to the use to which the trustee intends to put the money. The purchaser may safely assume that the price will be applied in an appropriate manner as trust property, unless special circumstances come to his notice indicating the opposite."

manner consistent with the best interests of the Tribe.[13]   In short, the Indian Claims Commission ordered the Government *qua* judgment debtor to pay $26 million to the Government *qua* trustee for the Tribe as the beneficiary.   Once the money was deposited into the trust account, payment was effected.

## III

The Danns also claim to possess individual as well as tribal aboriginal rights and that because only the latter were before the Indian Claims Commission, the "final discharge" of § 22(a) does not bar the Danns from raising individual aboriginal title as a defense in this action.   Though we have recognized that individual aboriginal rights may exist in certain contexts,[14] this contention has not been addressed by the lower courts and, if open, should first be addressed below.   We express no opinion as to its merits.

The judgment of the Ninth Circuit is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

---

[13] In suggesting that significant obstacles to the distribution of the money remain despite the transfer of the fund into a trust account, the Court of Appeals failed to recognize the legal strictures ensuring that the money will be applied to the benefit of the Tribe.   We have, for example, held that the United States, as a fiduciary, is obligated to make the funds productive and is fully accountable if those funds are converted or mismanaged.   See, *e. g., United States* v. *Mitchell,* 463 U. S. 206, 226 (1983); *United States* v. *Sioux Nation of Indians,* 448 U. S. 371, 408–409 (1980); *United States* v. *Shoshone Tribe,* 304 U. S. 111, 115–116 (1938); *Shoshone Tribe* v. *United States,* 299 U. S. 476, 497 (1937).

[14] *Cramer* v. *United States,* 261 U. S. 219, 227 (1923); *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339, 357–358 (1941); see generally Cohen, Original Indian Title, 32 Minn. L. Rev., at 53–54.