WESTERN SHOSHONE NATIONAL COUNCIL, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 05–558L.

United States Court of Federal Claims.

Sept. 19, 2006.

Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint.

## FACTS[1]

Since time immemorial, the Shoshone have occupied certain lands in what is now part of the United States. The Shoshone lived in extended family groups, or bands, and gathered together for ceremonial celebrations or food gathering activities. Today, they live in various communities in the same lands. Some of the bands of Shoshone are recognized by Congress under the Indian Reorganization Act, others are not.

During the United States' westward expansion, tensions arose between the United States and the western Indian tribes, including some of the Shoshone. When the Civil War began, the Union required additional resources, many of which were found in the West. The United States, seeking to avoid conflict with the Indians, entered into a series of treaties to ensure undisturbed passage to the resources of the West. These five treaties became known as the Doty Treaties after the Government's negotiator, Mr. James Doty. On October 1, 1863, the United States entered into a treaty with the "Western Shoshoni," which became known as the Treaty of Ruby Valley. 18 Stat. 689, Ratified June 26, 1866, Proclaimed Oct. 21, 1869.

In 1946, Congress sought to provide a means for Indian Tribes to bring historical claims against the United States for the taking of land and other related actions. To achieve that goal, Congress passed the Indian Claims Commission Act (ICCA). The ICCA created the Indian Claims Commission (ICC) and provided that Indian tribes could bring claims before the ICC for taken lands and had jurisdiction to hear cases filed within five years of the passage of the ICCA. The limitation provision made clear that "no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration." 25 U.S.C. § 70k (1976). Effectively, all claims existing on August 13, 1946 had to be filed by August 13, 1951 or be barred forever. *E.g. U.S. v. Lower Sioux Indian Community*, 207 Ct.Cl. 492, 519 F.2d

Jeffrey M. Herman, Herman & Mermelstein, P.A., Miami, FL, for Plaintiffs South Fork Band, Winnemuca Indian Colony, Dann Band, Te–Moak Tribe of Western Shoshone Indians, Battle Mountain and Elko Band.

Treva J. Hearne, Hager & Hearne, Reno, NV, for Plaintiffs Western Shoshone National Council and Timbisha Shoshone Tribe, with whom was Robert R. Hager, of counsel.

Sara E. Culley, United States Department of Justice, for Defendant, with whom was Thomas Bartman, United States Department of the Interior, of counsel.

## OPINION

SMITH, Senior Judge.

This is the latest litigation involving a claim to approximately 60 million acres that goes back more than fifty years. This action challenges proceedings before the Indian Claims Commission (ICC) and the Court of Claims. The Court has before it Defendant' Motion to Dismiss Plaintiffs Second Amended Complaint under Rules of the Court of Federal Claims (RCFC) 12(b)(1) and 12(b)(6). The Court held oral argument in Reno, Nevada on May 25, 2006 and in Washington, DC on June 14, 2006. For the reasons set forth in this opinion, the Court hereby **GRANTS**

1. The facts are compiled from the Parties' briefs and prior litigation in this and related cases.

1378, 1383 (1975). This case is brought by Plaintiffs concerning their rights under the Treaty of Ruby Valley of 1863 and issues of validity and enforceability against the Plaintiffs of a judgment rendered in the Indian Claims Commission (ICC).

## PROCEDURAL BACKGROUND

This case was originally filed in the United States District Court for the District of Columbia and was transferred to this Court on a Motion by Defendant.[2] After being transferred to this Court, the case was initially assigned to another Judge. Pursuant to this Court's rules, Defendant then filed a Notice of Directly Related Cases and the case was reassigned. Thereafter, Defendant filed its Motion to Dismiss Plaintiffs' Second Amended Complaint.[3] Both the South Fork Band and National Council filed opposition to Defendant's Motion, and Defendant replied. The Court then held oral argument over two days and now issues its opinion.

## STANDARD OF REVIEW

RCFC 12(b)(1) provides for the dismissal of claims if the Court lacks jurisdiction over the subject matter of the claims. It is well settled that "a party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists," *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991) (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936)), and that "subject matter jurisdiction is strictly construed." *Leonardo v. United States*, 55 Fed.Cl. 344, 346 (2003).

RCFC 12(b)(6) authorizes a court to dismiss a claim for failure to state a claim upon which relief can be granted. Claims must be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his legal claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## THE SECOND AMENDED COMPLAINT

### I. Count I

In Count I, Plaintiffs seek either a declaratory judgment that the ICC Judgment is not enforceable against them, or that the ICC Judgment is void under RCFC 60(b) because of alleged due process violations. Defendant argues that the Court should dismiss Count I under RCFC 12(b)(1) and 12(b)(6) because they are out of time and they fail to state a claim. The South Fork Band responds that they are entitled to relief under RCFC 60(b)(4) because they were denied due process before the ICC and there is no time limit for RCFC 60(b)(4). The National Council takes a somewhat different approach, although they incorporate all of South Fork Band's arguments. The National Council argues that the "sham" proceeding before the ICC denied them of due process and that they are, therefore, entitled to relief from it and all cases that rely on it, including those handed down by the Supreme Court of the United States. The National Council alleges that they have new evidence that no court has ever examined in the long history of this case. Further, they argue that they are not bringing a motion under RCFC 60(b), but rather an independent action allowed under the rule.

### A. Finality Provision of the ICCA

■ The Supreme Court and the Court of Claims have both made clear that the paramount purpose of the ICCA was to determine meritorious Indian claims with finality. *E.g. United States v. Dann*, 470 U.S. 39, 44–45, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985)

---

**2.** One portion of the Complaint, seeking to quiet title, was transferred to the District Court in Nevada. That Court has since denied Plaintiffs' claim.

**3.** After Defendant filed its Motion to Dismiss, Plaintiffs filed a substitution of counsel with regard to two of the named Plaintiffs. Plaintiffs South Fork Band, Winnemuca Indian Colony, Dann Band, Te–Moak Tribe of Western Shoshone Indians, Battle Mountain and Elko Band (collectively "South Fork Band") retained prior counsel. Plaintiffs Western Shoshone National Council and Timbisha Shoshone Tribe (collectively "National Council") retained new counsel. When referring to all of the Plaintiffs together, the Court will refer to "Plaintiffs." If, however, the Court is referring to one of the groups of Plaintiffs, it will refer to either "South Fork Band" or "National Council." When referring to Western Shoshone generally, the Court will refer to "Shoshone" or "Western Shoshone."

(quoting H.R. Rep. No 1466, 79th Cong., 1st Sess., 10 (1945)).[4] Defendant argues that the finality provision of the ICCA bars the current action. Section 22(a) of the ICCA states that "[t]he payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." 25 U.S.C. § 70u(a) (1976) (omitted after the dis-solution of the ICC). The Government argues that, given Congress's intent to draw all historic Indian claims to a close, the Court should apply § 22(a) to this count because it attempts to re-litigate long-settled issues. The Court certainly agrees that Congress has long desired to bring these claims to an end. However, it does not appear that Congress intended the finality provision to bar Rule 60 challenges to the ICC process. The Court of Claims allowed an independent action to proceed eight years after the payment of an ICC judgment. *Andrade v. United States*, 202 Ct.Cl. 988, 485 F.2d 660, 661 (1973). Therefore, the Court cannot dismiss Count I under § 22(a). That does not, however, end the inquiry.

### B. Timeliness of a Motion Under RCFC 60(b)

RCFC 60(b) sets forth the circumstances under which the Court may grant a party relief from a judgment or order that is not the result of clerical error. The text of RCFC 60(b) sets forth two distinct time limitations. As relevant here, a motion for relief based on "newly discovered evidence" must be filed "not more than one year after the judgment, order, or proceeding was entered or taken." RCFC 60(b). Further, with regard to a motion seeking relief from a void judgment under RCFC 60(b)(4), the rule states that it must be filed "within a reasonable time." *Id.* South Fork Band argues that there is no time limit on motions under RCFC 60(b)(4). They base their argument on cases from other circuits that have held that the passage of time cannot make a void

judgment valid. The Defendant argues that none of those cases deal with a delay this long and that the reasonable time requirement bars Count I.

■ While other circuits may reject time limits for Fed.R.Civ.P. 60(b), the Court of Claims made plain that motions challenging ICC procedures filed under Ct. Cl. Rule 152(b) (now RCFC 60(b)) must be filed within a reasonable time. *E.g. Pueblo of Santo Domingo v. United States*, 227 Ct.Cl. 265, 647 F.2d 1087, 1089 (1981). This determination is binding upon this Court. As the Federal Circuit made clear, "[t]here can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed.Cir.2006) (citation omitted); *see also Strickland v. United States*, 423 F.3d 1335, 1338 & n. 3 (Fed.Cir.2005). Therefore, to be timely, this motion must be filed within a reasonable time. In this case, the Court of Claims affirmed the ICC judgment in 1979. *Temoak Band of Western Shoshone Indians, Nev. v. United States*, 219 Ct.Cl. 346, 593 F.2d 994 (1979). Further, it appears that all of the procedural defects alleged by the South Fork Band took place before that date. Assuming that this Court could base its reasonableness determination on the district court complaint filed in September 2003, Plaintiffs would have to show that the 24 year delay was reasonable. They have failed to do so.

### C. Timeliness of an Independent Action Under RCFC 60(b)

■ Conceding the one year limitation imposed on motions introducing newly discovered evidence under RCFC 60(b)(1), the National Council frames its claim as an independent action. The Court of Claims made clear that the timeliness of an independent action contemplated under the rule is governed by the statute of limitations and lach-

---

4. National Council requests this Court set aside the *Dann* decision. National Council Br. at 7. It is clear, as stated above, "[t]here can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme

Court, our court, and our predecessor court, the Court of Claims." *Coltec Indus., Inc.*, 454 F.3d at 1353; *see also Strickland*, 423 F.3d at 1338 & n. 3.

es. *Andrade v. United States*, 202 Ct.Cl. 988, 485 F.2d 660, 664 (1973) (per curiam). As in all cases before this Court, 28 U.S.C. § 2501 imposes a six year statute of limitations. The *Andrade* Court held that the unexplained delay of eight years made the independent action untimely and dismissed that case. In this case Defendant argues that the facts the National Council claim are newly discovered were, in fact, clearly available and known to the Ninth Circuit and Supreme Court in *Dann.*

The National Council's attorneys have been particularly unhelpful in deciding this issue.[5] In the National Council's brief, they assert as "newly discovered" the fact that the ICC's Final Report listed twenty cases as "not report [sic] to Congress as completed." National Council Br. at 16. In support of this contention the National Council did not cite the ICC Final Report itself, but instead cited a book, published in 1990, which merely reproduced a chart from the ICC Final Report. *Id.* at 16 n. 32 (citing H.D. Rosenthal, Their Day in Court: A History of the Indian Claims Commission 266–67 (1990)). The National Council never explains how this fact, which is clearly stated in the ICC Final Report published in 1978, and Mr. Rosenthal's book published in 1990, could be newly discovered after 2000. All one had to do was open the report, an official publication of the United States Government, to see the footnote that the National Council raises in its brief. ICC Final Report, p. 125; National Council Br. at 16.

Oral argument only made Plaintiffs' position appear more unreasonable. As noted above, the National Council Brief raised the issue of the footnote to the ICC Final Report. The following exchange took place during oral argument:

MR. HAGER: It's been less than six years since they found out there was no final report. That's what I'm saying.

THE COURT: But that's not what your materials say. Your materials say 1990 is your source for finding that there was no

report. And that's, by my count, 15 years from the time the case was filed.

MR. HAGER: I didn't say 1990.

THE COURT: No?

MR. HAGER: No. I said within the last two or three years is when Steve Newcombe from the Indigenous Rights Institute learned that there was no final report.

THE COURT: But the source of that is a cite from a 1990 book, which may not have been in his library, but still was public record. And he's citing, from looking at the 1990 book, he's citing the 1979 report. So in 1979 it was public information.

Wash. Tr. at 39.[6] The National Council then made things worse by arguing that *United States v. Beggerly*, 524 U.S. 38, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998), supported its position that this Court could reopen this case. Wash. Tr. at 35–36. While presenting an accurate account of what the circuit court did in *Beggerly*, nowhere did the National Council's attorney mention that the Supreme Court reversed the circuit court's decision. *Beggerly*, 524 U.S. at 49, 118 S.Ct. 1862. This type of oral argument does a disservice to both the Court and the client.

■ In the end, the issue of whether this alleged defect in the ICC Final Report is newly discovered is not difficult. Newly discovered evidence is judged on an objective rather than subjective standard. Plaintiffs must show that they could not have discovered such evidence through due diligence prior to when they found it. The publication in an official publication of the United States, in 1978, is enough to put Plaintiffs on objective notice of this fact. Further, the republication of the same fact in a book documenting the history of the ICC in 1990 can only amplify the point that there was no newly discovered evidence. Thus, there is no basis to sustain an independent action 25 years after the fact. While the Court for the moment assumes this "newly discovered" evidence is actual evidence, reading it makes that highly unlikely. However, whether it

---

5. The Court wants to make clear that it in no way directs this criticism toward the counsel for the South Fork Band.

6. The Court will refer to the "Reno Tr." and "Wash. Tr." to differentiate between the two court sessions.

has any objective credibility is not critical to the Government's motion.

Therefore, the Court finds that Plaintiffs' Count I is untimely as either a motion under RCFC 60(b)(4) or an independent action. Because the statute of limitations in this Court constitutes a waiver of sovereign immunity, the Court must dismiss Count I for lack of subject-matter jurisdiction. As the Court will demonstrate below, even if Count I were timely, Plaintiffs have failed to state a claim.

### D. Merits of Plaintiffs' Claims and This Court's Authority Under RCFC 60(b)(4)

Even if the motion and independent action are timely, the Court finds that Plaintiffs have failed to state a claim under RCFC 60(b). In order to grant relief, the Court must find that a "grave miscarriage of justice" would result if relief is denied. *Beggerly*, 524 U.S. at 47, 118 S.Ct. 1862. In this case, Plaintiffs claim that their due process rights were violated by the proceeding before the ICC. The National Council argues that Defendant violated its rights by designating who would represent the Shoshone, choosing their attorney, limiting the claims allowed, and entering unsupportable stipulations. National Council Br. at 7. The South Fork Band states more generally that the ICC failed to provide procedural safeguards. South Fork Band Br. at 30–31. However, these same allegations have been presented to courts in the past and rejected. For example, the designation of the representative was challenged, and upheld, by the Court of Claims. *Western Shoshone Legal Defense & Educ. Ass'n*, 531 F.2d at 503. Further, Plaintiffs claim that the Plaintiffs before the ICC were denied the right to fire their counsel. However, when they did so, the proposed new counsel appeared and argued before the Court of Claims. *Temoak Band*, 593 F.2d at 995. Additionally, the

Supreme Court denied petitions for certiorari with respect to the cases that had been heard in the Court of Claims. *Western Shoshone Identifiable Group v. United States*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979); *Western Shoshone Legal Defense & Educ. Ass'n v. U.S.*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). The extraordinary relief allowed under RCFC 60(b) does not provide a second chance to appeal. Plaintiffs have failed to present any evidence that would show a grave miscarriage of justice that has not already been considered by a various federal courts. Therefore, even if Count I could be considered timely, Plaintiffs have failed to state a claim for which relief may be granted and the Court is compelled to dismiss it under RCFC 12(b)(6).

## II. Count II

In Count II, Plaintiffs seek to recover interest for taking of the Plaintiffs' "fee title land." South Fork Band Br. at 15–16. The Government moves to dismiss Count II because there is no waiver of sovereign immunity for prejudgment interest for the taking of the disputed land. *See Library of Congress v. Shaw*, 478 U.S. 310, 315, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (holding that the United States is immune from an award of interest absent an express waiver of immunity). Plaintiffs counter that Count II is argued in the alternative to Count I and is predicated upon the following two circumstances: "(1) the Court determines that the ICC Judgment is valid; and (2) the Court finds … that the ICC Judgment extinguished the [Plaintiffs'] 'independent treaty-based rights.'" *Id.* If Plaintiffs held Treaty Title to the disputed land, as opposed to aboriginal title,[7] then Plaintiffs claim they are entitled to interest because this would constitute a Fifth Amendment taking. The Court holds that it must dismiss this claim.

---

7. Aboriginal title is the right to exclusive possession that tribes hold as the result of occupying land from time immemorial. There is no waiver of sovereign immunity for the extinguishment of aboriginal title. Treaty title is the equivalent of fee title that is acquired through a treaty with the United States. Because it is the equivalent of fee title, the taking of property held under treaty title requires compensation under the Fifth Amendment, which includes interest. For an in depth examination of this distinction, *see Seneca Nation of Indians v. New York*, 206 F.Supp.2d 448 (W.D.N.Y.2002).

## A. Aboriginal Title

▌ Plaintiffs argue that the ICC did not deal with a significant portion of the Plaintiffs' land that they occupy under aboriginal title. The Plaintiffs claim that, at the least, the Treaty of Ruby Valley defined the area that the Plaintiffs occupy under aboriginal title. That area, described in Article V of the Treaty, amounts to approximately 60,000,000 acres of land. The ICC proceedings, according to Plaintiffs, only dealt with 24,000,000 acres. Reno Tr. 26–29; *See also Western Shoshone Identifiable Group v. United States,* 29 Ind. Cl. Comm. 5, 63 (1972) (finding aboriginal title to 22,211,753 acres in Nevada and 2,184,650 acres in California). Therefore, Plaintiffs claim that they still maintain aboriginal title to approximately 36,000,000 acres even if the ICC judgment was valid. South Fork Band Br. at 15 n. 5. Defendant responds that Plaintiffs' reading of the ICC judgment is flawed. According to the Government, the ICC dealt with the entire area and found that the Shoshones only established aboriginal title to the 24,000,000 acres. In the alternative, Defendant argues that even if Plaintiffs are correct, that the time and place to bring their claim to the 36,000,000 acres was before the ICC.

Plaintiffs' arguments cannot withstand scrutiny. The ICC dealt with all of the Shoshone aboriginal title claims, not just the 24,000,000 acres for which it awarded damages. The ICC defined with specificity the area that was exclusively used and occupied by the Western Shoshone Identifiable Group (*i.e.* the 24,000,000 acres). *Western Shoshone,* 29 Ind. Cl. Comm. at 413–14. The Commission stated that:

> Lands within the claimed area which have been found not to have been exclusively used and occupied by the four Shoshone land-using entities described herein include lands for which there is no substantial evidence of their respective exclusive use and occupancy and also lands used by various other tribes or groups of Indians.

*Id.* at 414. Further, Plaintiffs' claim to aboriginal title to the additional 36,000,000 acres cannot withstand the fact that the ICC determined that other tribes held such title to parts of that same land. As discussed above, aboriginal title requires that the claiming Indians must establish exclusive occupancy and use of the land, therefore, it is impossible for more than one tribe to hold aboriginal title to the same land. The ICC held that the Shoshone Tribe, which was distinct from the Western Shoshone, held aboriginal title to land extending from Twin Falls, Idaho "southwest to the Western Shoshone identifiable group's northeastern boundary line . . .; thence southeast along said Western Shoshone boundary line . . .; thence in a direct northeasterly line . . . ." *Id.* at 412. The Goshute Tribe held aboriginal title to lands from Wendover, Utah "due west to the Western Shoshone group's boundary line . . .; thence south along the Western Shoshone boundary to Kimberly, Nevada; thence east . . . ." *Id.* at 413. Further, in other cases, the ICC determined that the Northern Paiute and the Indians of California held aboriginal title to other tracts within the 60,000,000 acres, including all of the land in California not established as Western Shoshone land in the ICC decision. *Indians of California v. United States,* 8 Ind. Cl. Comm. 1 (1959).

Therefore, the ICC dealt with aboriginal title to all 60,000,000 acres and determined that the Western Shoshone only established aboriginal title to approximately 24,000,000 acres. The parties then stipulated that the aboriginal title had been extinguished as of July 1, 1872. Under the ICC judgment, Plaintiffs no longer hold aboriginal title to any of the 60,000,000 acres and the claim must be dismissed for lack of subject-matter jurisdiction.

## B. Treaty of Ruby Valley

▌ Underlying much of the litigation presently before the Court is the Treaty of Ruby Valley and the proper interpretation of it. Plaintiffs argue that the Treaty grants them treaty title. The Government argues that the Treaty was merely one of friendship and that it conveyed no treaty rights to any of the lands described in it. Much of the briefing submitted on this topic involved the meaning of the Supreme Court's decision in *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 65 S.Ct. 690, 89

L.Ed. 985 (1945). Defendant argues that *Northwestern Bands* precludes the determination that Plaintiffs ever held treaty title to the land. Plaintiffs argue that *Northwestern Bands* did not rule upon an interpretation of the Treaty of Ruby Valley. Rather, Plaintiffs argue the Court reviewed a different treaty, the Box Elder Treaty. The Court finds this argument to be without merit. In *Northwestern Bands,* the Supreme Court discusses all of the treaties entered into with the Shoshones in 1863, which were "similar in form." 324 U.S. at 343, 65 S.Ct. 690. Further, the Court's conclusion that no recognized title had been conferred is stated in terms clearly applicable to the Treaty of Ruby Valley. *Id.* at 348, 65 S.Ct. 690. Following a discussion in which the Court specifically referenced the Western Shoshone treaty, the Court stated "nowhere in any of the series of treaties is there a specific acknowledgment of Indian title or right of occupancy." *Id.*

South Fork Band also argue that recognized title may be reasonably inferred from the language used in the Treaty of Ruby Valley. South Fork Band Resp. Br. at 9. The Court disagrees. Even though there is no particular form necessary for congressional recognition of Indian right of permanent occupancy, "there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation." *Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 278–79, 75 S.Ct. 313, 99 L.Ed. 314 (1955) (citation omitted). And specifically, in *Northwestern Bands,* the Supreme Court stated that such definite intention was lacking in the language employed in the Treaty of Ruby Valley. 324 U.S. at 348, 65 S.Ct. 690. It is clear to the Court that Plaintiffs cannot rely on the allegation that the Treaty of Ruby Valley recognized the Western Shoshones' ownership of land. Accordingly, the Court finds that the claim must be dismissed for Plaintiffs can not prove any set of facts in support of their claim that would entitle them to relief.

8. These arguments are the South Fork Band's. The National Council does not argue this issue specifically, but it does expressly incorporate all

## III. Count III

In Count III, Plaintiffs seek royalties for minerals mined from the disputed land under the Treaty of Ruby Valley. Defendant argues that this Count is barred by the statute of limitations and the finality provision of the ICCA. Defendant argues that because the ICC Judgment includes a $4,604,600 award for minerals removed from the land, § 22 bars this Count. *Temoak Band,* 593 F.2d at 996; 40 Ind. Cl. Comm. 318, 452 (1977). Plaintiffs [8] argue that the finality provision cannot bar this case because it was repealed before the payment of the ICC judgment. Alternatively, they argue that it is not jurisdictional. They finally argue that the ICC procedure was not followed, therefore, the finality provision was never triggered in this case.

### A. The Exclusive Jurisdiction of the ICC

■ Defendant argues that the ICC had exclusive jurisdiction over any claim seeking to recover royalties under the Treaty of Ruby Valley. The Court has already noted that when Congress passed the ICCA, it sought to bring all meritorious claims to conclusion. To that end, the ICC had jurisdiction to hear cases filed within five years of the passage of the ICCA. The limitation provision made clear that "no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration." 25 U.S.C. § 70k (1976). Effectively, all claims existing on August 13, 1946 had to be filed by August 13, 1951 or be barred forever. *E.g. Lower Sioux,* 519 F.2d at 1383. Further, the Indian Tucker Act grants the Court of Federal Claims jurisdiction over claims "accruing after August 13, 1946." 28 U.S.C. § 1505 (2000). Plaintiffs argue that this Count accrued after 1946, however, they do not explain that proposition. The Treaty, entered in 1863, expressly obligated the United States to pay the Western Shoshone $5,000 per year for twenty years. It is impossible to conclude that the

of the South Fork Band's arguments. National Council, Br. at 1. With this caveat, the Court will refer to "Plaintiffs" in this section.

failure to pay treaty mandated compensation, based on a treaty entered in 1863, did not accrue before 1946. There is no indication of any payment after the twenty years required by the text of the Treaty. Therefore, the Court must dismiss this Count because it was within the exclusive jurisdiction of the ICC.

## B. The Finality Provision of the ICCA

■■■ Even if jurisdiction over Count III was not placed exclusively in the ICC, the Court would be required to dismiss this Count because of the finality of the ICC Judgment. Plaintiffs' argument that the finality provision of the ICCA is not jurisdictional is untenable. The finality provision, ICCA § 22, states that:

[P]ayment of any claim, after a determination under the Act, shall be a full discharge of the United States of all claims and demands touching on any of the matters involved in the controversy.

(b) A final determination against a claimant made and reported in accordance with the Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

25 U.S.C. § 70u (1976) (omitted 1978). This provision constitutes a limitation on the Government's waiver of sovereign immunity. *See Dann,* 470 U.S. at 45, 105 S.Ct. 1058. Therefore, if it applies to Count III, the finality provision would remove jurisdiction from this Court.

The Court must determine if the finality provision may still apply now that the ICCA has been omitted from the U.S.Code. Plaintiffs argue that the ICCA was repealed effective September 30, 1978 when the ICC was terminated. Pub.L. 94–465, 90 Stat. 1990 (Oct. 8, 1976). Therefore, Plaintiffs argue that § 22 cannot apply to this case because the payment of the ICC judgment was not until December 6, 1979. Plaintiffs assert that the ICCA had been repealed by that time. Plaintiffs further seek to limit the *Dann* decision to simply deciding when payment occurred, arguing that *Dann* does not

decide whether the ICCA applied to payments made after September 30, 1978. This argument, however, miscomprehends the history of the ICCA and the *Dann* decision. There is nothing in the history of the ICCA to indicate that it has ever been repealed. In terminating the ICC, Congress modified two provisions; it did not repeal any. Pub.L. 94–465, 90 Stat. 1990. Instead, the ICCA has been omitted from the U.S.Code after the termination of the ICC. *See* South Fork Band Br. at Ex.'s 5 & 6.

Plaintiffs also fail to explain why the Supreme Court would decide *Dann* if the payment of the ICC judgment would have no effect. Indeed, the *Dann* Court was clearly aware that ICCA § 22 would preclude certain of the Danns' claims if the Court found payment had occurred. The *Dann* Court reversed the Ninth Circuit because the circuit's decision "would frustrate the purpose of finality by *postponing the preclusive effects of § 22(a)* while subjecting the United States to continued liability for claims and demands that 'touch' on the matter previously litigated and resolved by the Indian Claims Commission." *Dann,* 470 U.S. at 45, 105 S.Ct. 1058 (emphasis added). Because payment of the ICC judgment occurred after the omission of the ICCA from the U.S.Code, *Dann* clearly establishes that the ICCA's finality provision may still act to bar claims against the Government.

Plaintiffs' argument that § 22 cannot bar this Count because the final report was never filed also fails to survive review. As discussed above, this cannot be the basis of relief under RCFC 60(b). Further, the Supreme Court clearly stated that the preclusive effect of § 22 bars further claims upon payment of the ICC award and thus this Court is bound by that determination.

## IV. Count IV

In Count IV, Plaintiffs [9] ask the Court to order Defendant to provide "an accounting of the proceeds from disposition or use of the land, including without limitation, mining ac-

---

9. These arguments are the South Fork Band's. The National Council does not argue this issue specifically, but it does expressly incorporate all

of the South Fork Band's arguments. National Council, Br. at 1. With this caveat, the Court will also refer to "Plaintiffs" in this section.

tivities in accordance with Section 4 of the Treaty of Ruby Valley." Compl. ¶ 76. Defendant argues that this Court lacks the necessary equitable jurisdiction to order such an accounting until Defendant's liability is established. Plaintiffs respond that the Court must look at Count IV in conjunction with Counts III and V, and may therefore retain jurisdiction. Further, Plaintiffs allege, and Defendant denies, that Defendant took an inconsistent position in the district court and should not now be allowed to change its position.

Preliminarily, it is clear that no argument made to the district court may alter the subject-matter jurisdiction of this Court. Jurisdiction in this Court may only be conferred by Congress. *E.g. Transcountry Packing Co. v. United States,* 215 Ct.Cl. 390, 568 F.2d 1333, 1336 (1978). Thus, even if Defendant argued to the district court that this Court was the only court with jurisdiction over this claim, and convinced the district court to transfer the case here, that does nothing to help this Court determine its jurisdiction over this claim. The subject-matter jurisdiction of this Court cannot be established by estoppel.

The Court finds that it does not have jurisdiction over Count IV. If taken as an independent claim, South Fork Band concedes that this Court lacks jurisdiction. Even if the Court could retain jurisdiction over this Count as South Fork Band argues, the Court cannot do so here because it is dismissing Counts III and V in this opinion. Therefore, the Court dismisses Count IV for lack of subject-matter jurisdiction.

## V. Count V

In Count V, Plaintiffs seek damages for alleged breaches of fiduciary duties that Plaintiffs argue were owed by the Government to Plaintiffs. Defendant argues that Count V should be dismissed for lack of

subject-matter jurisdiction in this Court. First, Defendant argues, the relief sought in Count V is barred by the exclusivity and finality provisions of the ICCA. Second, Defendant argues that even if Count V survives its ICCA challenge, it is untimely under the six-year statute of limitations found in 28 U.S.C. § 2501 (2000). Plaintiffs[10] respond that the ICCA does not bar this Count and that the statute of limitations has not begun to run in this case because the Government has not repudiated the relationship or provided an accounting of Plaintiffs' funds.

Without reaching the ICCA argument, this claim is clearly out of time under this Court's generally applicable statute of limitations. 28 U.S.C. § 2501. Because § 2501 constitutes a waiver of sovereign immunity, its bar deprives this Court of subject-matter jurisdiction over untimely claims. *E.g. Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir.1988). The statute of limitations begins to run at the time of "first accrual," which is the time when all of the facts necessary to establish liability have taken place. *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847, 851 (1966). These facts, of course, must not be inherently unknowable at the time they occur. *Menominee Tribe v. United States,* 726 F.2d 718, 720–22 (Fed.Cir.1984). In the case of a trust relationship, the statute does not begin to run on a breach unless the fiduciary expressly repudiates the relationship or provides an accounting of trust funds. *E.g. Osage Tribe of Indians of Oklahoma v. United States,* 68 Fed.Cl. 322 (2005). A trustee, however, may repudiate the relationship through "actions inconsistent with [its] obligations under the trust." *Jones v. United States,* 801 F.2d 1334, 1336 (Fed.Cir.1986) (citation omitted).

Assuming *arguendo,* that the Government owed a fiduciary duty to the Plaintiffs under the Treaty of Ruby Valley,[11] it is impossible to accept the Plaintiffs' view that the Government has not long ago repudiated such a

10. These arguments are the South Fork Band's. The National Council does not argue this issue specifically, but it does expressly incorporate all of the South Fork Band's arguments. National Council, Br. at 1. With this caveat, the Court will also refer to "Plaintiffs" in this section.

11. The Supreme Court has held that pervasive control over Indian lands can be found to create a fiduciary relationship with the Government. *United States v. Mitchell,* 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In this case, the language in the Treaty of Ruby Valley does not appear to grant such pervasive control to the United States. Therefore, for the sake of this

relationship. Ever since the initial case before the ICC, filed in 1951, the Government has denied that the Plaintiffs retained *any* interest in the disputed land. *E.g. Western Shoshone Legal Defense & Educ. Ass'n v. United States,* 209 Ct.Cl. 43, 531 F.2d 495, 500 (1976) (noting that "the Government consistently maintained that the Indians never owned the lands they claimed"). That position, repeated in numerous cases over 55 years, is irreconcilable with the Government acknowledging its role as a fiduciary. It is also impossible to conclude that Plaintiffs only became aware of the Government's position within the last six years. For the purposes of § 2501, Count V first accrued in the 1950's when the Government denied that the Plaintiffs had any interest in any of the disputed 60 million acres.

The Plaintiffs also point to *Osage Tribe* to support their claim that appropriations acts have set aside the statute of limitations until an accounting has been provided. *Osage Tribe,* however, does not apply to this case because *Osage Tribe* dealt with a trust fund expressly created by statute. *Osage Tribe,* 68 Fed.Cl. at 325–26. In this case, Plaintiffs can only claim that the Treaty of Ruby Valley created a trust relationship with regard to the lands and assets of the land described in the Treaty. However, the Federal Circuit has made it clear that the setting aside of the statute of limitations until an accounting is provided applies only to cases of trust fund mismanagement, not asset mismanagement. *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 364 F.3d 1339, 1350 (Fed.Cir.2004). Therefore, the Court must dismiss Count V for lack of subject-matter jurisdiction.

## CONCLUSION

For the reasons set forth in this opinion, the Court hereby GRANTS Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint. The Clerk is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

argument, the Court will assume, without deciding, that such a relationship did exist.